### Hewett M. REEVES
### v.
### INTERNATIONAL TELEPHONE & TELEGRAPH CORPORATION.
### Civ. A. No. 13234.

United States District Court,
W. D. Louisiana,
Shreveport Division.
April 27,· 1973.

Leroy H. Scott, Jr., Shreveport, La., for plaintiff.

Ben E. Coleman, Morgan, Baker, Skeels & Coleman, Shreveport, La., Gordon E. Jackson and W. Kerby Bowling, Bowling, Brackhahn & Jackson, Memphis, Tenn., for defendant.

## OPINION

DAWKINS, Chief Judge.

This action was instituted by Reeves, a microwave field engineer, against International Telephone & Telegraph, his former employer, for overtime pay allegedly due under the Fair Labor Standards Act. 29 U.S.C. § 201 et seq.

I. T. & T. is a well known world-wide diversified corporation with substantial earnings. It also is a conglomerate of huge scope, owning stock control over many varied corporations having no connection with the field of electronic communication. (Witness the Ditta Beard Affair of 1971–72.)

There has been no disagreement as to jurisdiction having been conferred upon this Court by the provisions of 28 U.S.C. § 1337.

Defendant contends that plaintiff, as a microwave field engineer, was employed by it in a *bona fide* executive, administrative, or professional capacity within the meaning of 29 U.S.C. § 213(a)(1) and the regulations issued thereunder; and that he therefore is exempt from the overtime compensation benefits of 29 U.S.C. § 207. We hold otherwise; and our reasons follow:

This decision, the transcript, and evidence upon which it is based are limited to the issue of whether the plaintiff was employed in a *bona fide* executive, administrative, or professional capacity. All other issues have been pretermitted, by agreement of the parties, until resolution of this question.

Title 29 U.S.C. § 213(a)(1) provides, in pertinent part, the following:

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to—

"(1) Any employee employed in a *bona fide* executive, administrative, or professional capacity, . . . (as such terms are defined and delimited from time to time by regulations of the Secretary) . . . ."

It should be foremost in our consideration of this action that exemptions contained in the Fair Labor Standards Act are to be narrowly construed against the employer. Brennan v. Great American, Inc., 477 F.2d 292, 1973 (5th Cir.); Shultz v. Louisiana Trailer Sales, Inc., 428 F.2d 61 (5th Cir., 1970) cert. den'd 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139.

The issue is clear—if Reeves' employment does not fall within the scope of the exemptions, then he is covered by the Act and entitled to compensation for overtime pay.

We turn now to the regulations issued by the Administrator of the Wage-Hour Division as directed by the Act. They are found at 29 CFR § 541.0, et seq. These regulations establish certain basic criteria which an employee must meet to be considered exempt under the Act. The regulations provide two standards by which an employer's claim of exemption may be determined, *i. e.*, the "streamline test" or the "long test." In applying the "long test," a court may decide that an employee is exempt from the Act's coverage only if the conditions of the employee's employment are such as to satisfy the requirements as set

forth in Sections 541.1, 541.2, and 541.3. However, if an employee was paid on a salaried basis of not less than $150 per week at the time of his employment, then the employer's contention that he is exempt may be determined by the use of the "streamline test" (at present this minimum rate is $200 per week). Therefore, we first must determine whether Reeves was employed on a salary basis, and, if so, was this salary basis at a rate of not less than $150 per week?

■ Of course, as noted, the burden clearly is upon the employer affirmatively to show that the plaintiff-employee is within the scope of the exemption. *Great American, Inc., supra*; *Idaho Sheet Metal Works, Inc., v. Wirtz*, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); *Louisiana Trailer Sales, Inc., supra*.

The Secretary's interpretations of the General Regulations Subpart A are found at Subpart B of Title 29 CFR, beginning at Section 541.99. Section 541.-118 provides strong guidance for determining when an employee will be considered to be paid on a salary basis within the meaning of the Regulations:

> " . . . [I]f under his employment agreement he regularly receives each pay period on a weekly, or less frequent, basis a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed . . . the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked."

Of course, defendant urges that plaintiff here made in excess of $150 weekly on a salary basis as required under the interpretation just quoted. The evidence readily bears out defendant's contention as far as that minimum figure is considered alone. When plaintiff began working for defendant, he was compensated at a monthly salary of $700, or $161.54 a week. Adams, personnel director of defendant during plaintiff's tenure, testified he had sent plaintiff a letter confirming defendant's offer of $700 for employment as a microwave engineer. Adams further testified that plaintiff would receive this $161.54 per week, whether he worked 40 hours or not. Gradually, Reeves received yearly increases—not hourly increases—$8400 per year to $9,000, and from $9,000 to $9,500.

He participated in I.T. & T.'s long-term disability insurance plan and also in its hospital and life insurance plan. The carrier for the latter plan for salaried employees was Equitable Life Assurance Society, whereas Travelers Insurance Company was the carrier for those employees paid at an hourly rate. Reeves participated in Equitable's plan. The former plan was available only to salaried employees and not to persons employed on an hourly basis. Moreover, all witnesses testified that microwave engineers were employed on a salaried basis unless there was a special agreement providing otherwise. Reeves alleges that such a special agreement was entered into; however, Adams says that he had no authority to enter such agreement, which he denies he did enter in the first place with Reeves.

■ Of course, plaintiff contends he was employed on an hourly basis. He points out that there were over 120 entries from the employer's pay roll ledger showing an hourly rate of pay; that he was required to keep hourly records, and that he worked for a certain number of hours and was paid a certain wage based on those hours. In response to this testimony, defendant adequately has shown that the employee's salary was broken down to an hourly rate in order to show how much the employee would be compensated for overtime work, *i. e.*, Reeves was paid straight time for any time over 40 hours per week. Also, it was neces-for him to keep hourly records for billing purposes as concerned defendant's customers. Therefore, based upon the foregoing, we find that plaintiff was compen-

sated on a weekly salary basis at a rate equivalent to not less than $150 per week, exclusive of board, lodging, and other facilities. It also is readily apparent from the evidence, although not pertinent to the exemption question, that Reeves worked substantially in excess of 40 hours per week, on which occasions he was not paid overtime compensation at not less than one and one-half times his regular rate of pay for the hours worked in excess of 40 hours during a work week.

The "streamline tests" for the respective exemptions urged by defendant to be applicable to plaintiff are as follows:

"Section 541.1 Executive

\* \* \* \* \* \*

"(f) . . . [A]n employee who . . . is compensated on a salary basis at a rate of not less than $150 per week . . . exclusive of board, lodging, or other facilities, and whose primary duties consist of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees there'n, shall be deemed to meet all the requirements of this section.

"Section 541.2 Administrative

\* \* \* \* \* \*

"(e) . . . [A]n employee who . . . is compensated on a salary or fee basis at a rate of not less than $150 per week . . . exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance of work described in paragraph (a) of this section which includes work requiring the exercise of discretion and independent judgment shall be deemed to meet all the requirements of this section.

"Section 541.3 Professional

\* \* \* \* \* \*

"(e) . . . [A]n employee who . . . is compensated on a salary or fee basis at a rate of not less than $150 per week . . . exclusive of

board, lodging, or other facilities, and whose primary duty consists of the performance either of work described in paragraph (a)(1) or (3) of this section, which includes work requiring the consistent exercise of discretion and judgment, or of work requiring invention, imagination . . . shall be deemed to meet all the requirements of this section."

It next becomes necessary to consider the nature of each such exemption. We begin with the executive classification. The interpretation of the term "management" is found at section 541.102:

"(b) For example, it is generally clear that such work as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: Interviewing, selecting and training of employees; setting and adjusting the rates of pay and hours of work; directing their work; maintaining the production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; . . ."

■ The general definition of "primary duty" is found at section 541.103: " . . . in the ordinary case it may be taken as a good rule of thumb that primary duty means a major part, or over 50%, of the employee's time." However, time alone is not the sole test, and an employee might have management as his primary duty if other factors support such a conclusion. Some of these pertinent factors are the frequency with which the employee exercises discretionary powers, his relative freedom from supervision and the relationship between

his salary and the wages paid other employees for the kind of non-exempt work performed by a supervisor.

To determine whether there is a department or subdivision involved, guidance is found at Section 541.104:

"(a) . . . The phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of men assigned from time to time to a specific job or series of jobs and a unit with permanent status and function. In order properly to classify an individual as an executive he must be more than merely a supervisor of two or more employees; nor is it sufficient that he merely participates in the management of the unit. He must be in charge of and have as his primary duty the management of a recognized unit which has a continuing function.

"(b) . . . Questions arise principally in cases involving supervisors who work outside the employer's establishment, move from place to place, or have different subordinates at different times."

He also customarily and regularly must supervise at least two full-time employees or the equivalent. Section 504.-105.

■ Although the evidence showed that Reeves planned some work, apportioned some work among subordinates, determined types of materials, supplies, machinery, or tools to be used, or merchandise to be bought, management was not his primary duty, nor did he manage a customarily recognized department or subdivision, and his work did not include the customary and regular direction of the work of two or more other employees. In most instances, Reeves was alone at the job site or with one other individual. The record also shows that plaintiff was very rarely, if ever, in complete charge of any particular installation project even if such installation projects were to be classified as a recognized subdivision of I.T.&T., which is doubtful at best. Nor did defendant ac-

tively urge in its brief that Reeves was executively exempt under the Act. Therefore, we conclude that Reeves could not be considered executively exempt.

■ To be exempt administratively, Reeves' primary duty must have consisted of the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers, which includes work requiring the exercise of discretion and independent judgment. The primary duty requirement for the administrative exemption is the same as for the executive exemption.

■ Section 541.203 reflects that the exemption is intended for white collar employees who meet the test of the regulations. Nevertheless, Section 541.2 does not prohibit completely performance of manual work by an administrative employee. The performance of some manual work which is directly related to the work requiring the exercise of discretion and independent judgment would not cause the exemption to fall. However, if the employee performs so much manual work that he cannot be said basically to be a white-collar employee, he does not qualify for exemption as a *bona fide* administrative employee even if the manual work he performs is directly and closely related to the work requiring the exercise of discretion and independent judgment.

"Thus, it is obvious that employees who spend most of their time using tools, instruments, machines, or other equipment, or in performing repetitive operations with their hands, no matter how much skill is required would not be bona fide administrative employees within the meaning of § 541.2

That the work performed be directly related to management limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers. This phrase also includes those whose

work affects policy or whose responsibility it is to execute or carry it out. CFR § 241.205.

Section 541.207 explains the discretion and independent judgment requirement:

"(a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in the regulations in Subpart A of this part, moreover, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

"(b) The term must be applied in the light of all the facts involved in the particular employment situation in which the question arises. . . .

"(c) Distinguished from skills and procedures;

"(1) Perhaps the most frequent cause for misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2. This is true even if there is some leeway in reaching the conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

"(2) A typical example of the application of skills and procedure is ordinary inspection work of various kinds. Inspectors normally perform specialized work along standardized lines involving well established techniques and procedures which may have been cataloged and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They have some leeway in the performance of their work but only within closely prescribed limits. Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections . . . but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards. In such cases a decision to depart from the prescribed standards of the permitted tolerance is typically made by the inspector's superior. The inspector is engaged in exercising skill rather than discretion and independent judgment within the meaning of the regulations and Subpart A of this part."

Clearly Reeves in no way was a white-collar employee. Therefore, to be administratively exempt it would be necessary that his performance of manual work be directly and closely related to work requiring the exercise of discretion and independent judgment. Unfortunately for I.T.&T., the discretion and independent judgment that Reeves exercised in his employment was the type described above, i. e., Reeves used a skill and his knowledge to follow prescribed procedures or to determine which procedure to follow and used specified standards to determine whether the performance of the equipment installed fell within a predetermined tolerance. He did this with the use of testing and measuring devices, although quite complicated and even though there was some leeway in reaching a conclusion, the acceptable standard included a range or a tolerance above or below a specific standard which had to be achieved. Moreover, Reeves spent a portion of his time using tools, instruments, and other equipment in performing operations with his hands. Pier, also a microwave engineer for I.T.&T., testified that he

spent approximately 60% of his time using tools, instruments, and other equipment in performing operations with his hands. Plaintiff's Exhibit No. 11 also confirms that Reeves did not hold an administrative position with I.T.&T.: this is an executive performance evaluation record of the company and it shows that Reeves was an assistant in five out of six cases evaluated in this report. In the other case evaluated, the testimony showed that he was working under Pier on the Richfield Project.

Defendant relies heavily and almost exclusively upon Mitchell v. Transcontinental Gas Pipeline Corp., 16 Wage & Hour 89 (S.D.Tex.1963), to convince us that plaintiff is exempt both administratively and professionally and mentions the regulations only in passing. On the other hand, plaintiff does not even mention the above case and relies exclusively upon the regulations. Plaintiff offers us no ground in his brief upon which to distinguish the *Mitchell* case from the present fact situation, nor does defendant offer us guidance through the regulations. In the *Mitchell* case, it was held that radio technicians were employed in a *bona fide* administrative and professional capacity. The employment status and responsibilities there are quite similar to those involved here. Notwithstanding the similarity, we feel that the duties and responsibilities performed by Reeves did not attain that degree of accomplishment which would require him to be exempt under the Act.

The microwave engineer title bestowed upon employees by I.T.&T. clearly does not and cannot mean that mere bestowal of a title causes every such designated employee to be considered exempt under the Act. For we must consider the individual plaintiff's responsibilities and tasks, even though he held a job title which may be thought to be exempt after considering the description of tasks and responsibilities such job supposedly entailed.

■ It is true that Reeves was assigned to remote areas of the earth and did have the responsibility of getting equipment to the job site. In some instances, he programmed the work, but he was not completely in charge of any job for any extended period of time. To conclude that plaintiff was employed in a *bona fide* administrative capacity during his entire tenure because he was in charge of one or two jobs for a period of time would be to completely disregard the legislative intent.

Plaintiff's authority to make local purchases was limited to amounts under $25.00, any expenditure above this amount needed approval except for traveling, living expenses, and things of this nature. Nor did defendant show that plaintiff consistently contracted for labor to assist him to move the equipment to the job site.

Surely having discretion as to what method to use in getting material to the job is not such discretion and independent judgment which is of substantial importance to management or operation of the business that it would require the person to be exempt.

■ Consequently, we readily conclude that defendant has not carried its burden of proving Reeves was administratively exempt and find that the evidence shows Reeves' activities do not fall within those contemplated by the regulations.

■ Finally, we now turn to the issue of whether Reeves was exempt because he was employed in a *bona fide* professional capacity. To fall within the exemption, Reeves must have performed work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study as distinguished from a general academic education, or from an apprenticeship, or from training in the performance of routine mental, manual or physical processes, and this type work also must include consistent exercise of discretion and judgment.

■ Of course, as stated earlier, the exemption of any individual depends upon his duties and other qualifications

and not upon how the employer classifies the employee. The Secretary's interpretations of the regulations found at Section 541.308 inform us that not all employees in any particular occupation are exempt and also make special reference to the field of engineering, commenting upon the fact that there are many persons with engineer titles who are not professional engineers, as well as many who are trained in engineering professions who actually are working as trainees, junior engineers, or draftsmen, who are not exempt. Also, in this context, the Wage and Hour Division has determined against extending the professional exemption to cover certain highly paid technicians, mostly in the electronics and aero-space fields. The Division felt that most highly paid technicians reached that pay level only after many years of on-the-job experience; and that the more valuable move into supervisory or administrative positions where the executive or administrative exemptions are available. Volume 6 Labor Relations Reporter, BNA Wage and Hour Manual § 92:683.

Reeves' educational background consists of approximately two years of college undergraduate work, two months of trade school, plus four to five months in a signal and radio intelligence school while he was in the military. The remainder of the knowledge he acquired in the electronics field was obtained through on-the-job training, working with equipment under supervision, and through self-study, enabling him to become more proficient in the field.

Without contradiction, persons employed as microwave field engineers by I.T.&T. did not acquire knowledge of an advanced type in the field of science or learning customarily through a prolonged course of specialized intellectual instruction as distinguished from an apprenticeship. It is uncontradicted that almost all persons employed in this field acquired their knowledge through self-study and on-the-job training which consisted of working with technical equipment over long periods of time.

Although we do feel that the knowledge here involved is of a highly technical nature in a field of science, it is not acquired customarily through a prolonged course of specialized intellectual instruction. In this context, the word "customarily" implies, in the vast majority of cases, that specific scientific and academic training is a prerequisite for entrance into the profession, and thus it makes available the exemption only for that occasional person who has not met the requirement. Here we have the opposite situation—for microwave field engineers, it is customary that the requisite knowledge not be acquired by a prolonged course of specialized intellectual instruction and study, but through experience and self-study, i. e., apprenticeship. The distinction is found at § 541.302:

"(2) The areas in which professional exemptions may be available are expanding. As knowledge is developed, academic training is broadened, degrees are offered in new and diverse fields, specialities are created and the true specialist, so trained who is given new and greater responsibilities, comes closer to meeting the test. However, just as an excellent legal stenographer is not a lawyer, these technical specialists must be more than highly skilled technicians. Many employees in industry rise to executive or administrative positions by their natural ability and good common sense, combined with long experience with a company, without the aid of a college education or degree in any area. A college education would perhaps give an executive or administrator a more cultured and polished approach but the necessary know-how for doing the executive job would depend upon the person's own inherent talent. The professional person, on the other hand, attains his status after a prolonged course of specialized intellectual instruction and study."

Throughout the testimony here, it is apparent that a microwave field engineer's primary duty was not the per-

formance of tasks requiring special electronic knowledge, although such knowledge (obtained by experience) was a prerequisite to being hired for the position. The vast majority of time was spent finding the equipment after it arrived at the designated place; loading it, carrying it to the site; unloading it, placing it in a proper place according to the blueprints, and then bolting, and attaching it. In this context, Reeves testified that "the majority of my time spent working for I.T.&T. was in traveling, accumulation of equipment, getting it out to the sites, packing, unpacking, physically standing the equipment up, bolting it down, bolting it together, bolting pieces in racks, wiring, soldering." He stated that this accounted for approximately 80% of his work.

■ Factually, Reeves indeed did modify equipment himself and suggest changes at other times. He had equipment replaced in certain instances. He was required to interface equipment at times. He performed electronic tests; however, he had predetermined tolerances which the tests had to meet. He also provided on-the-job training for customer's employees. These facts being true, plaintiff's job basically was assisting others to set up microwave towers and testing the equipment. A Mr. Juban, an antenna contractor, stated that he had acquired enough knowledge to accomplish about 90% of all this type work over a period of time, coupled with his antenna experience. He never attended trade school for instructions in this field. Thus it is quite clear to us that this plaintiff is not a "professional" within the meaning of the Act. Considering the entire record, it becomes plainly apparent that Reeves did not have the same duties and authority as did the radio technicians in the *Mitchell* case.

Although Reeves did at times exercise discretion and judgment, both in a professional capacity and in an administrative capacity, these were not his primary duties in the context required by the regulations. Therefore, considering the record as a whole, we are forced to conclude that Reeves was not employed in a *bona fide* executive, administrative, or professional capacity with I.T.&T. This is true even though the job denomination itself might be exempt: Reeves' duties, even though he enjoyed such a high-sounding title, were not of the type for him to be exempt under the Act.

Nevertheless, considering the importance of the questions involved, we shall be willing to certify them as controlling and decisive, as to which reasonable minds might differ, for an interlocutory appeal application to be made, pursuant to 28 U.S.C. § 1292(b).