**550**

Joe S. HICKMAN, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 46–85C, 571–85C.

United States Claims Court.

Aug. 8, 1986.

As Amended Aug. 15, 1986.

Joseph E. Foster, Orlando, Fla., for plaintiffs.

Paul J. Ehlenbach, Washington, D.C., with whom was Asst. Atty. Gen., Richard K. Willard, for defendant. Naomi Miske, Office of Navy Litigation, Alexandria, Va., of counsel.

## OPINION

NETTESHEIM, Judge.

### BACKGROUND

This opinion incorporates by reference the findings of fact and conclusions of law

issued from the bench and memorializes several legal conclusions of significance. The modified bench ruling is appended to this opinion. Some of the facts underlying plaintiff Joe S. Hickman's action were discussed in *Hickman v. United States*, 8 Cl.Ct. 748 (1985) (motion to compel production of documents).* Subsequently, Mr. Hickman's action was consolidated with the cases of plaintiffs Milton K. Bennett, No. 571–85C, and Allen S. Loun, No. 572–85C. The parties reached an accommodation of Mr. Loun's case before trial, and the court made no findings of fact or legal conclusions with respect to him.

Plaintiffs Hickman and Bennett ("plaintiffs") sued for overtime compensation pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b) (1982) (the "FLSA"). For many years plaintiff Hickman has been a GS–856–12 Electronics Technician, and since April 1981 plaintiff Bennett has been a GS–334–12 Computer Equipment Analyst. The Office of Personnel Management (the "OPM") in July 1984 sustained plaintiffs' exemption from coverage by the FLSA under 29 U.S.C. § 213(a)(1) and Federal Personnel Manual ("FPM") Letter No. 551–7 Attachment ¶ A.2 (July 1, 1975), as "Administrative Employees."

The court tried the case *de novo* with the framework for decision that coverage determinations under the FLSA turn on the facts with respect to each affected plaintiff. *See, e.g., Martin v. Penn Line Service, Inc.*, 416 F.Supp. 1387, 1389–90 (W.D. Pa.1976); *Reeves v. International Telephone & Telegraph Corp.*, 357 F.Supp. 295, 302 (W.D.La.1973), *aff'd*, 616 F.2d 1342, 1351 (5th Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981). The bench ruling detailed those facts which clearly established that each plaintiff properly has been classified as exempt consistent with the applicable legal standards and with the principle that FLSA exemptions must be narrowly construed against the employer. *See* FPM Letter 551–7 Attachment B.2.A; *see also Reeves*, 357 F.Supp. at 297.

Specifically, it was found that each of the individuals during the period April 1984 to present primarily has been engaged in the provision of supporting services of substantial importance to the David W. Taylor Naval Research and Development Center (the "Center"), a component of the Department of the Navy. Each provides services of predominantly nonmanual character consisting of work of a specialized or technical nature that requires considerable expertise, training, and knowledge. Each plaintiff also exercises discretion and independent judgment in performing his normal day-to-day work, although the job descriptions of both plaintiffs differ. Finally, it was found that all individuals who work with plaintiffs in the Acoustic Trials Detachment (the "ATD") of the Center perform fungible work, rotating leadership and supervisory responsibilities and exercising somewhat unique but complementary expertise. This enables the ATD personnel as a team to discharge the ATD's mission aboard the vessel MONOB ("Mobile Noise Barge") to acquire accurate and valid data of acoustical signatures of submarines at different speeds. The members of the ATD have total responsibility for the accuracy and validity of all data recorded and processed on the vessel, including total knowledge of how the system works, even though some, including plaintiffs, lack underlying theoretical knowledge.

## DISCUSSION

1. *Extension of limitations period by filing administrative claim*

At the conclusion of plaintiffs' case in chief, defendant moved pursuant to

---

* This order disallowed discovery of records of named non-plaintiff employees, distinguishing *Dolan v. Project Construction Corp.*, 725 F.2d 1263 (10th Cir.1984), and *Kinney Shoe Corp. v. Vorhes*, 564 F.2d 859 (9th Cir.1977). In *United States v. Cook*, 795 F.2d 987 (Fed.Cir.1986), the Federal Circuit allowed discovery only of names and addresses of federal employees for purposes of notifying potential plaintiffs of their right to opt into a Fair Labor Standards Act case brought under 29 U.S.C. § 216(b) (1982).

RUSCC 41(b) to dismiss that part of the claims preceding three years from the date on which the complaints were filed. 29 U.S.C. § 255(a) provides that the statute of limitations for willful violations of the FLSA is three years; for other than willful violations a two-year period is set. Plaintiff Hickman, by letter of May 17, 1982, submitted his claim to the General Accounting Office (the "GAO") for the period from June 1976 to that date. Plaintiff Bennett's claim with the GAO was filed on his behalf by the OPM on May 21, 1982. Although the OPM reviews agency FLSA exemption determinations, the GAO processes these matters as administrative claims. The applicable statute of limitations for filing a claim with the GAO is six years pursuant to 31 U.S.C. § 3702(b)(1) (1982). Plaintiffs filed their lawsuits in 1985. Both plaintiffs contended that the Civil Service Commission, predecessor to the OPM, had misled plaintiff Hickman about his judicial remedies in 1976 and that plaintiff Bennett relied on the misinformation given to plaintiff Hickman. They also charged that the OPM, in collusion with the Center, for the purposes of frustrating and prolonging appeals of FLSA exemption determinations, had instituted a moratorium in 1982 on FLSA exemption determinations involving Navy engineers and technicians classified as GS–11 and above. The court found that plaintiffs had failed to adduce facts to support these contentions.

Apart from the lack of evidentiary support, plaintiffs misconceive the effect of filing with the GAO. The lawsuit challenging exemption status under the FLSA proceeds *de novo* ; the OPM and GAO decisions play no role in determining whether the Government has sustained its burden to uphold an exemption by clear evidence. What plaintiffs sought to effect by lodging their claims with the GAO was to extend the maximum three-year statute of limitations for FLSA court actions to six years preceding the date that an administrative claim is lodged with the GAO. In the case of plaintiff Hickman, for example, this argument, if accepted, would extend the statutory recovery period for the court action

to 1976, *i.e.*, six years prior to filing with the GAO in 1982. In effect, plaintiffs sought both to engraft the six-year administrative statute of limitations onto this court action and to toll any applicable statute of limitations for the court action once they had filed administrative claims.

No legal authority exists to support plaintiffs' argument that the recovery period in a court action could be extended by filing with the GAO, and the argument is rejected emphatically. In fact, Congress deliberately adopted a short period of limitations for FLSA actions. The maximum three-year period is at least three years shorter than the statute governing most other actions filed in this court. When the FLSA was made applicable to federal employees in 1974, *see Hickman v. United States*, 8 Cl.Ct. 748, the FLSA's statute of limitations was not altered, and no congressional intent was manifested in the amending language or its underlying legislative history that federal employees would be accorded a more liberal limitations period than employees in the private sector. Therefore, plaintiffs do not gain the benefit of the longer administrative limitations period in their court action, assuming that filing with the GAO had any impact on the FLSA's statute of limitations.

■■■ Other federal cases involving claims under the FLSA and under the Equal Pay Act, both of which incorporate section 255(a) as their statute of limitations, have addressed the separate issue whether filing claims with the GAO tolls a statute of limitations from the date of filing. These courts uniformly have held that the mere filing of an administrative claim does not toll the statute of limitations imposed by section 255(a). *Aguilar v. Clayton*, 452 F.Supp. 896, 898 (E.D.Okla.1978) (FLSA claim); *see also Erickson v. New York Law School*, 585 F.Supp. 209, 214 (S.D.N.Y.1984) (Equal Pay Act claim); *Melanson v. Rantoul*, 536 F.Supp. 271, 285 (D.R.I.1982) (Equal Pay Act claim). *But cf. Bowen v. City of New York*, ⸺ U.S. ⸺, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) (tolling of statute of limitations allowed on

Social Security disability benefits claim where equitable tolling held consistent with Congress' intent in enacting the statute and appropriate on the facts of the case and Secretary of Health and Human Services authorized to toll the 60–day limit). The rationale of these cases is persuasive: Since filing an administrative claim is not a mandatory prerequisite to judicial relief, the claimant is not prevented from pursuing a judicial remedy prior to, or concurrently with, administrative relief. Furthermore, "an aggrieved employee seeking overtime compensation can immediately file a court action and then apply for a stay pending the outcome of his administrative remedies...." *Aguilar*, 452 F.Supp. at 899. Given that statutes having the effect of waiving sovereign immunity are to be strictly construed, *see United Construction Co. v. United States*, 7 Cl.Ct. 47, 50 (1985) (order denying motion for summary judgment) (citing cases), the filing of plaintiffs' claims with the GAO does not toll the FLSA's statute of limitations or entitle them to a longer period within which damages can be recovered in a subsequent action brought in federal court.

### 2. Standard for determining willful violation under the FLSA

29 U.S.C. § 255(a) establishes a three-year limitations period if a violation of the FLSA is willful. *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.), cert. denied, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972), held that the standard for determining willfulness is whether the employer knew that the FLSA was "in the picture." *Jiffy June* has enjoyed an almost unblemished record of mechanical application to private sector employers, and plaintiffs ask that the *Jiffy June* standard be applied in the federal sector cases, as well. Relying on *Walton v. United Consumers Club, Inc.*, 786 F.2d 303 (7th Cir.1986), defendant urges that the standard for gauging willfulness in the FLSA's statute of limitations should be reckless disregard. The Seventh Circuit derived this standard from *Trans-World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), in which the Supreme Court held that a willful violation of the Age Discrimination in Employment Act, is the predicate for awarding double damages under the liquidated damages provision of that Act. 29 U.S.C. § 626(b) (1982). The Court rejected *Jiffy June*'s "in the picture" standard because the liquidated damages provision was construed as punitive. The Supreme Court stated: "Even if the 'in the picture' standard were appropriate for the statute of limitations, the same standard should not govern a provision dealing with liquidated damages...." 105 S.Ct. at 625 (footnote omitted). Subsequently, two courts of appeals have declined to apply *Thurston*'s reckless disregard standard to the FLSA's statute of limitations. *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1117 (4th Cir.1985); *Secretary of Labor v. Daylight Dairy Products, Inc.*, 779 F.2d 784, 789 (1st Cir.1985).

Plaintiffs are correct that because the FLSA is remedial, not punitive, legislation, the *Thurston* standard applicable to a punitive damages provision should play no role in determining the standard of willfulness under the FLSA statute of limitations. The inquiry, however, is not resolved, because the question remains whether *Jiffy June*'s "in the picture" standard is applicable in actions brought against the Government. That question must be resolved in the negative.

In cases involving private sector employers, common sense dictates that violations be deemed willful if an employer knows that the FLSA is in the picture, because an employer's awareness of an FLSA violation stems from an investigation by the Department of Labor. Thus, after such an investigation is initiated and an employer becomes aware of it, the employer who persists in actionable conduct is acting willfully: The employer is continuing to exempt an employee when the employer's conduct has come under scrutiny by the officials who ultimately will decide whether the exemption should be sustained.

■ Although few courts have deviated from *Jiffy June*'s standard, the adherence is not completely slavish. Examining the section 255(a) "willfulness" language in an Equal Pay Act claim, the court in *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), opted for a more limited standard. The court would find an employer's noncompliance willful "when he is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt." 567 F.2d at 462. The court supported its standard by noting that Congress conditioned the expansion of the statute of limitations to three years with a willfulness requirement to ensure that "excusably inadvertent violators" would not bear the burden of the heavier three-year statute of limitations. *Id.* at 460, 461. More recently, a district court, also interpreting section 255(a)'s willfulness requirement, adopted the *Laffey* court's standard and emphasized that a "significant uncertainty" by the employer whether the federal wage law would apply is sufficient to show that a violation of the Act is not willful. *Melanson v. Rantoul*, 536 F.Supp. at 285.

This standard makes eminent sense when the Government is the employer, because the OPM—the counterpart to the Department of Labor in federal sector cases—is part of the employing entity itself. The OPM dictates all procedures for the hiring, payment, and advancement of federal civilian personnel, such as plaintiffs, so that the FLSA is always in the picture. Were the "in the picture" standard adopted, willfulness under section 255(a) would be a *per se* rule, since no component of the Federal Government could ever take the position that the FLSA was not in the picture. By prescribing a standard of willfulness, however, Congress did not intend that the three-year statute of limitations would be a *per se* rule. Rather, Congress legislated that a threshold showing would be made of willful conduct by some standard appropriate to remedial legislation. In this context

willfulness should mean the absence of a significant uncertainty whether the FLSA applies to cover an employee.

■ From the outset of plaintiffs' efforts to challenge their exemption status, a significant uncertainty existed whether they were exempt from the FLSA's coverage. From 1974 until 1976, in fact, plaintiffs were deemed non-exempt, because their job titles were not included on a list of jobs considered to be exempt once coverage had been extended to federal employees. In 1976 the Navy began to make more particularized review of duties performed, which led to plaintiffs' exempt classification. The original decision that plaintiffs should be covered was not the product of any reasoned analysis or review of the duties and responsibilities actually performed by plaintiffs. In contrast, the decision to exempt plaintiffs in 1976 followed a review of their duties and responsibilities. In these circumstances the OPM and the Center held a significant uncertainty whether plaintiffs properly were or were not subject to the FLSA's overtime provisions.

Accordingly, had a violation of the FLSA been found, it would not be willful. The applicable statute of limitations is two years. In the case of plaintiff Hickman, the period ran from January 1, 1983, two years before he filed suit; for plaintiff Bennett, the period commenced on September 30, 1983.

## CONCLUSION

■ The court having found and concluded that plaintiffs properly were exempt from the period April 1984 to the present, their complaints shall be dismissed from that date forward. The parties have settled plaintiffs' claims for the balance of the two-year period. A stipulation will be filed by the parties terminating the litigation as to the claims periods that have been settled.

IT IS SO ORDERED.

No costs.

## APPENDIX

*Excerpts from June 9, 1986 Bench Ruling*

I had announced earlier that it was my inclination to apply a two-year statute of limitations under 29 U.S.C. § 255(a). I have evaluated the evidence in that regard. I find that had any violation been found, it would not have been willful because there was a significant uncertainty as to whether the provisions of the FLSA would have exempted the duties of both plaintiffs. For purposes of this case, defendant always knew that the FLSA was in the picture, but never acted willfully with respect to its application.

As a matter of fact, if we go back in history, we find that in 1974, when the FLSA became applicable to federal employees, there was a decision to cover the plaintiffs because their job titles did not appear on a list of titles that were considered exempt, and then there was a reversal of that position based on factors that were never before me. Then we come up to the next situation, which is events beginning in 1981 involving plaintiffs' and others' efforts to test their status under the FLSA. At that point the Office of Personnel Management, which took over for the Civil Service Commission, in conjunction with the Department of Navy, did what I believe was a masterful job of trying to get some order out of a morass of different situations that were said by their proponents to be without the exemptions. I do not think the moratorium that occurred was irresponsible in the least; it was the only method that could have assured any consistency among decisions, at least at the administrative level.

So, as of the time I started to look at the case, which is the early 1980s, it was very clear that a significant uncertainty existed as to the applicability of the FLSA in terms of the exemption status of these plaintiffs. I am not judging the situation that existed before that date.

Now, the parties have told me that they have reached a disposition with respect to the period before April 1984. What that represents for plaintiff Hickman is January 4, 1983, to April, 1984, and for plaintiff Bennett, from September 30, 1983, to April 1984. I will not make any findings with respect to those periods. I have not made any decision with respect to those periods. I offer no indication of what my decision would have been, nor am I saying that my decision would have been with respect to those periods any different if I had been required to decide the whole case. I do point out that two witnesses listed by defendant have not testified because of the disposition that has been reached. So I am proceeding to make findings without the benefit of two witnesses who would either have assisted or not assisted defendant's case, depending on what would have come out with respect to the classification of plaintiffs, the auditing of their job descriptions, and their testimony concerning the actual duties performed. One of the witnesses was on site with plaintiff Hickman while he was performing his job.

Because of the decision I make, it is not necessary to make any findings on good faith, because I do not find liability for the period of April 1984 to the present. I only note that I have not had any evidentiary predicate for such findings.

To the extent that Mr. Hamilton and Ms. Althouse's testimony would have borne on willfulness under section 255(a), I can only infer that it would have been cumulative to the findings I have made with respect to the period at which I am looking.

I am not going to make any findings with respect to the professional exemption. I have concluded that the exemption that applies is the so-called administrative exemption. I will say nothing with respect to the professional exemption except the following.

First, do not infer that I think it either applicable or not applicable. I emphasize I am not making any findings about it. Secondly, I think the record should point out a problem with it. It creates what I am going to call a reverse presumption. When one gets to the point of dealing with this

exemption, one goes from the regulations in 5 C.F.R. to the Federal Personnel Manual. The Federal Personal Manual contains guidelines to help determine the result in different situations.

Paragraph B.2 of FPM 551–7, Joint Exhibit 20, deals with general considerations in interpreting and applying the exemption criteria. Paragraph C deals with guidance concerning application to specific categories. Part C.3, found on page 19, gives guidance with respect to the application of only one of these criteria and that is the professional. So the standards of paragraph C.3.d on page 21 of FPM 551–7, apply only to the professional exemption. They establish what I am going to refer to as a reverse presumption. There is no reverse presumption, in other words, as I read these regulations with respect to any other exemption.

The reverse presumption in this case is that below GS–9 it is unusual for an employee to be exempt. For grades 12 and above, it is unusual not to be exempt. What the provision says is that an individual who has acquired knowledge through on-the-job training and practical experience, when the knowledge is extremely limited and specialized, cannot be rendered exempt unless (1) that knowledge rises to the level of advanced theoretical knowledge or (2) the individual has a role in giving program-type advice.

In other words, the focus of that particular exemption seems to be that there will be individuals so highly skilled by virtue of their empirical knowledge, as opposed to their degreed knowledge, that they might be viewed as professional, but they should not be exempted unless these two other criteria are satisfied. However, the whole matter has to be looked at from the point of view that it would be unusual that they would not be exempted, which is the reverse presumption.

I am not dealing with this particular presumption because no findings will be made on the professional exemption. Suffice it to say, however, that the FPM letter has created a reverse presumption that would be virtually impossible to apply with any degree of meaningfulness. I am dealing with the administrative exemption which is found on pages 3 to 4 of the FPM letter under paragraph 2.A.2.

The pertinent provisions relevant to my assessment of the facts for the period April 1984 to present provide that the employee's primary duty must consist of work that involves supporting services of substantial importance to the organization. That is subparagraph 2.a. Subparagraph 2.b requires that the employee must perform predominantly nonmanual work which is of a specialized or technical nature that requires considerable specialized training, experience, and knowledge. Subparagraph 2.c. requires that the employee must frequently exercise discretion and independent judgment under only general supervision in performing the normal day-to-day work.

I will discuss these elements of the various standards that I have found applicable in a moment. First, I would like to give you the framework that I have used to examine them.

I am dealing with the period April 1984 to present which is when Mr. Jebsen took over for Mr. Clark. I do not make findings before that period except insofar as conduct before that period implicates what went on after.

This case is uniquely fact intensive. I received in the mail a decision that was filed on June 3rd of this year by one of my colleagues, Judge Harkins, in a case called *Boston Shipyard Corp. v. United States* [10 Cl.Ct. 151], Nos. 557–84C & 337–85C, filed as I said, June 3rd [*appeal docketed,* No. 86–1553 (Fed.Cir. Aug. 5, 1986)]. And I want to read to you what Judge Harkins said on page 8 of the slip opinion.

I am paraphrasing a little. Judge Harkins wrote: The principal issue in this contract case was fact intensive. "In such a context, the credibility of witnesses assumed special significance. During the trial, the testimony of the fact witnesses, for both parties, obviously was shaped to forward their particular cause. Memories

were perfect as to the details of matters that were helpful, but nonexistent as to entire subjects that were seen as potentially harmful.... As a result, written records contemporary with the events involved are considered to be more accurate and are accorded greater weight than the reconstructed versions presented in trial testimony."

This is the framework I am adopting for my findings. And without casting any aspersions on individuals, I simply must. These are matters about which the individuals on both sides have strong feelings that have developed over what appears to be a minimum of a five-year period. On the management side, FLSA coverage would have programmatic implications for the future. And on plaintiffs' side, there is a feeling of having been aggrieved that has been observed and perceived by the court and which has entered into plaintiffs' testimony and has been duly noted by the court.

In other words, you have a situation, except with respect to only one witness I could find, where there was a definite self-interest motivating testimony that went beyond the pure ascertainment of the factual issues. And that one witness is Mr. Clark. Mr. Clark is the only individual—he was the supervisor of plaintiffs for approximately a four-year period before Mr. Jebsen—who seems to stand apart. With respect to Mr. Kenard and Mr. Berger, these individuals work for present contractors, who have a significant interest in, if you will, fallout from this case. And there could be implications as to their contracts. I feel that less of Mr. Berger than Mr. Kenard. The same with Mr. Hartge. He is an individual who filed what he referred to as a grievance, which was a request for review of his exemption status. [The bench ruling contains the full credibility findings for Messrs. Clark, Kenard, Berger, and Hartge.]

Mr. Clark's testimony had the benefit of several strong features. He is an uniquely articulate individual who is capable of expressing himself in a variety of ways, both conceptually and practically. He definitely tried to be helpful to both sides. He showed a strong regard, and even affection, for the plaintiffs, and he had a strong sense of professionalism which he evidenced in his explanations for taking various personnel actions.

Mr. Jebsen, his successor, seemed much less familiar with the operations aboard the MONOB. That does not mean that the work performed on the MONOB necessarily is more independent, because what that would mean is any time you had a supervisor who could not tell you where every "i" was dotted and every "t" was crossed, you necessarily had individuals who are exempt. That is a non sequitur. Mr. Jebsen's strengths lie more in the management and overview side than the particularized knowledge of the MONOB's operations, which Mr. Clark had, and on which I relied greatly, because Mr. Clark is no longer affiliated with the management structure of the MONOB.

Regarding Mr. Hickman and Mr. Bennett, there were two areas that gave me problems. First, in reading their trial reports, and I read all the ones that were admitted into evidence, there was a definite fall-off in certain of Mr. Hickman's trial reports after the period when he basically took the view that he wanted to back down on his activities as lead man and facilities project manager and even for a period of time before that period.

If I had to call the date, I would note a definite drop off in both individuals' reports, in terms of discussions of individual acts of decision-making, recommendation-making, leadership, beginning in 1983 in the case of Mr. Hickman, and not so much during 1983 in the case of Mr. Bennett. However, a drop-off was noticeable to someone who studied these reports for Mr. Bennett, as well.

Mr. Hickman's testimony with respect to his duties as facilities project manager conflicted with that of Mr. Bennett. Mr. Hickman testified that when he was facilities project manager, he worked an eight-hour day, plus a full four hours as facilities project manager completing reports and

schedules, reviewing assignments, and so forth. He gave a much more vital view to that role than Mr. Bennett's testimony did. As a matter of fact, Mr. Bennett's testimony, as to that particular role, conflicted with his trial reports, which gave it a much more important gloss.

I find, based on my observation of demeanor and assessment of credibility, that Mr. Hickman essentially backed off on his role as lead man—his job description role as well as his functional role aboard the MONOB and full-time facilities project manager on or about November 28, 1984, when, pursuant to his request, he was formally relieved of those duties. I think that the process began before Mr. Jebsen arrived in April 1984. Mr. Bennett backed away from some of his work on the computer system at his request after October 1984.

The implications are very important to an FLSA case. You cannot have an individual structuring the performance of his duties to qualify or not qualify for the FLSA exemption. Obviously, you want every individual to structure his duties in the best possible way to qualify for advancement. But assuming that professional—and by "professional," I mean grade level advancement—is not in the picture, you cannot have an individual who analyzes his job and attempts to remove from it those features that would seem to exempt him from FLSA coverage.

The MONOB is a small operation. The individuals work intimately due to physical constraints, but also due to the ATD's operational inter-functions. It has been very apparent to me in this trial that all the individuals aboard the MONOB have a great deal of knowledge about this lawsuit, its implications, FLSA coverage, and what the administrative exemption means or does not mean. It is my view that there has been, with respect to Mr. Hickman and Mr. Bennett, a tailoring of their duties and responsibilities in response to some of these considerations. The evidence of record, including the memorandum from Mr. Jebsen that I referred to, as well as

Mr. Bennett's request to be relieved from computer program responsibilities, exemplifies what I am discussing.

Therefore, on this basis, I would have to give Mr. Bennett and Mr. Hickman a diminished credibility factor and rely on their reports and job descriptions, as well as the testimony of others, as to what work they do and have done. This is most significant with respect to Mr. Bennett, who has a job that is absolutely unique on a vessel whose mission is absolutely unique. I am, therefore, giving some weight to what the job descriptions say the individuals do. I realize that in any FLSA case the job descriptions are not decisive. I am not making them decisive. I am not making them fulfill the role of my determining what these individuals do. I am just pointing out that in the context of what I believe is the stepping back from duties, they do play a definite role.

I talked to you about the particular exemption I am going to apply in the context of these findings. There is guidance given in the FPM letter about how to apply it. And that is found on page 9, paragraph B.1.h. When one is dealing with general management, business, or supporting services, one must distinguish specialists who provide supporting services from those who provide production functions. I have no difficulty in saying that the provision of accurate and valid data is a service. Data processing itself has always been determined in any context to be a service and not a production of any item such as the hardware itself. The administrative employees in this category provide support to line managers by providing expert advice on specialized subject matter fields, such as that provided by management consultants or systems analysts; assuming facets of the overall management function, such as safety management; representing management in such business functions as determining acceptability of goods or services; or providing supporting services, such as automated data processing.

There is a caveat. Subparagraph B.1.h. says, "However, to warrant exemption,

each employee's work must involve substantial discretion on matters of enough importance that the employee's actions and decisions have a noticeable impact on the effectiveness of the organization advised, represented, or serviced." I believe that the individuals comprising the ATD jointly and individually have the responsibility for the accuracy and validity of all data recorded and processed on MONOB, and I consider that a supporting service in terms of the overall mission of MONOB to provide acoustic signatures of submarines at different speeds.

Under this guidance, the work is predominantly non-manual. *Reeves [Reeves v. International Telephone & Telegraph Co.,* 357 F.Supp. at 301–02], for example, is a case that involved work that was determined to be 60 percent manual. The labor regulations do not have the caveat "predominantly nonmanual" in any event. But there has been no basis in the testimony to characterize the work as manual in any significant sense over a minor percentage.

The work is of a specialized or technical nature that requires considerable experience, training, and knowledge. And we have some guidance as to what that phrase means, "work of special or technical nature" in subparagraph B.1.k. at page 10. The FPM letter says, "Work which requires substantial specialized knowledge of a complex subject matter and of principles, techniques, practices and procedures associated with that subject matter field" should be considered work of a specialized or technical nature. "These knowledges characteristically are acquired through considerable on-the-job training and experience in the specialized subject matter field, as distinguished from professional knowledges characteristically acquired through specialized academic education."

What is important to note is that this particular section does not equate this specialized or technical knowledge to that acquired when one obtains a college degree. There is no comparability. There is, in fact, a distinction. In other words, if you have empirical knowledge that derives from considerable on-the-job training and it is specialized, one has work of a specialized or technical nature. And the individuals clearly have that here.

Not one witness, including either plaintiff, has failed to attest to the need for maturity in exercising the various judgments that must be exercised. What one learns simply by virtue of being aboard the MONOB for a period of time are very valuable knowledges to the employer and very singular knowledges to the employee, given the unique mission of MONOB. These knowledges are enhanced to some extent by the fact that we have other unique features. We do not have the documentation that could exist in another context for the system. As Mr. Hartge said, he knows the signal path "absolutely." As Mr. Clark said, he would expect a degreed person to spend considerable time, perhaps as much as up to two years, in becoming totally comfortable on board the MONOB. You also have instances where one employee is mapping out the work of another because it is difficult. Mr. Hartge developed a patch panel book in order to make easier access into the patch panel design that Mr. Bennett developed.

The next element that we have to look into, and the most telling here, is whether there is the exercise of discretion and independent judgment in performing normal day-to-day work. Guidance is provided on the same page in subparagraph 1. as to what this discretion and independent judgment must be. It involves "(1) comparing and evaluating possible courses of conduct, and (2) interpreting results or implications, and independently taking action or making a decision after considering the various possibilities...." However, "[F]irm commitments or final decisions are not necessary to support exemption." The decision made as a result of the exercise of independent judgment "may consist of recommendations for action rather than the actual taking of action...."

There are further examples given in terms of subinquiries—that is, the work must involve sufficient variables as to reg-

ularly require discretion and judgment in determining approaches and techniques to be used. Therefore, the exemption does not cover an individual who applies the standardized techniques or knowledge of established procedures that govern the employee's actions. The employee must have authority to make determinations during the course of assignments. This avoids exempting trainees. The decisions made independently must be significant, and that means significant to the overall mission and ultimately to the employer.

29 C.F.R. § 541.207(a)–(c), Defendant's Exhibit 207, pages 202–03, flush out this very elusive criterion. These sections provide that if one exercises discretion and independent judgment when he is comparing and evaluating possible courses of conduct and making a decision after the various possibilities have been considered. The decision includes the concept of recommendations.

The recommendations, though, must be based on the development of the facts as to whether there is a conformity with prescribed standards. In other words, what is involved here is an assessment or judgmental factor that goes beyond the concept of mere skill.

29 C.F.R. § 541.207(c)(7) is directed specifically to the data processing field. It is the only guidance I found that helped flush out whether Mr. Bennett's job, looking at the computer analyst function, involved the kind of judgment and independent discretion that would qualify for exemption. The position itself, computer equipment analyst, is unique, and it was created for Mr. Bennett. There are elements of systems analyst in the job description, and he has had programming responsibilities since he got the job description, Joint Exhibit 7, in 1981, specifically, the categorization of the hydrophone sensitivities and shipping the ranging data to the third octave and the narrowband systems. He has had responsibility and had discharged it for computer integration and determining whether the software was accurate and up to date during Mr. Clark's tenure.

Mr. Bennett was regarded by Mr. Clark as interfacing with respect to systems design, and Mr. Clark viewed him as exhibiting understanding of the design of the signal process, as well as general principles of basic electrical engineering. During what I refer to as the recent past, Mr. Bennett has not performed functions of this nature, but he was supposed to. And he had shown that he could do them. And even though Mr. Clark left at the beginning of the period as to which I am making findings, I see no reason why Mr. Bennett's duties and responsibilities do not entail what he was doing previously and showed a capability for doing. Furthermore, his position essentially has not changed.

29 C.F.R. § 541.207(c)(7) states that in the data processing field, a systems analyst is exercising discretion and independent judgment when he develops methods to process business information by using electronic computers. A systems analyst also exercises discretion and independent judgment when he determines the exact nature of a data processing problem and structures the problem in a logical manner so that a system to solve the problem to obtain the desired results can be developed. A computer programmer would also be using discretion and independent judgment when he determines exactly what information must be used to prepare the necessary documents and in ascertaining the exact form in which the information is to be presented. According to the federal labor regulations, duties that do not involve judgment and discretion are the actual running of the computer by the programmer or the debugging of a program. A mere computer operator who does nothing else would not be exercising the requisite discretion and independent judgment.

I find that, based on the limited duties of this nature that have been performed by Mr. Bennett after Mr. Joy came in 1982, and after April 1984, when Mr. Bennett was backing off from his responsibility for on-line data processing, as the computer equipment analyst aboard the MONOB, Mr. Bennett exercised the requisite discre-

tion and independent judgment of a computer analyst. In addition to that function, Mr. Bennett had occasion to recommend acquisitions of systems, as exemplified by Defendant's Exhibit 231. Mr. Clark believed that Mr. Bennett had total knowledge of how the system works without 100 percent grasp of the theoretical knowledge. This assessment is compatible with the definition of the specialized knowledge necessary for this particular exemption.

With respect to Mr. Bennett, I believe that if he had carried forward during this period performing the duties that he had performed, and there was no evidence that management dissuaded him from continuing or ordered him not to continue, he would have exercised sufficient judgment and discretion in this area of specialized knowledge with respect to the provision of a very important supporting service to qualify for the exemption in a very clear manner.

Since 1984 the function of facilities project manager has been rotating. The reason I have not discussed the function specifically with reference to Mr. Bennett or Mr. Hickman before is I wanted to go into what the ATD does itself. Plaintiffs have taken the position that all members of the ATD are basically fungible. They all provide the support function that I have indicated. They are all knowledgeable in how the system works and interrelates. They are all responsible for troubleshooting without established guidelines or parameters. They all achieved their expertise in whatever they are doing through maturity and experience. They are exercising judgments in solving problems, as opposed to mere skills, because of the lack of prescribed routes to the solution of problems.

After hearing six days of testimony and making an on-site inspection of the MONOB, I am in general agreement that this is probably true.

Reading the trial reports, I saw many instances where individuals on the control console would alert other ATD members, the cognizant official of the Radiated Noise Branch, or the officer in charge of problems and engage in a direct interface. There were individuals who, without any particular direction, began troubleshooting to find problems that would enable them to more adequately and properly fulfill their mission. In other words, we are dealing with individuals who have a sense of responsibility. They are not working above and beyond the duty. They are doing the duty which is to provide a team effort to deliver this service. And each of the individuals has a particular expertise or system or systems which he operates well, perhaps better than others. But they all share this characteristic of getting their work done without prescribed guidelines as to how they do it. They make comparisons and evaluations of possible courses of conduct and action or making decisions, and they act and make decisions after various possibilities have been considered in consultation with each other or individually. Troubleshooting is an improvised approach by all the members, and the solutions are improvised.

Now, what is the significance of the fact that we have rotating facilities project managers since April 1984 and that we do not have Mr. Hickman as lead man? Mr. Hickman asked to be relieved from the duty of lead man and full-time facilities project manager. And Mr. Bennett had substituted for Mr. Hickman before and no longer functions as his direct substitute, but also rotates. It would seem to me to be unfair to say that because Mr. Hickman and Mr. Bennett had achieved some seniority, these individuals should be regarded as exempt and that individuals who were on the same path but did not have the high degree of experience and maturity are not exempt. This would, in my view, be a fundamental unfairness.

I have tried to view the members of the ATD in terms of their similarities, not their differences that are the result of number of years on board. And I think that it is significant that the facilities project manager in what I call the recent past, or from April 1984 to the present, has been rotating

among certain members. These members act as the branch head's representative on site. According to the trial reports, they clearly provide a coordination function. They do much more than arrange for the safe transshipment of personnel to the MO-NOB, and they interface with the trial director and the officer in charge or the Radiated Noise Branch manager. They coordinate not only who works and when people work, but how the solution to a given problem is to be ascertained and then improvised or executed. In other words, each person can do his own job and he can also function as a coordinator because he knows enough generally about other individuals' jobs to know whom to call and to get a job done and generally where to look to start devising the solutions for problems.

Mr. Hickman's particular expertise would be array deployment, and Mr. Bennett's would be in computer programming and patch panel. But I do not think tying this kind of decision into a particular expertise is really the point. I believe plaintiffs about their fungibility and the fungibility of the members of ATD, and I think that the trial reports are supportive that there is a very high level of discretion and judgment, as opposed to mere skill, being exercised on board that vessel by one and all, getting progressively higher as one moves up the experience line. The threshold level though, in my opinion, constitutes the requisite for exemption under the administrative function.

I would like to talk a minute about items in the trial reports that show the kind of things that the facilities project manager does, but that other individuals from time to time have done, as well.

Starting with Mr. Bennett's, who has more reports during this period, Defendant's Exhibit 230. On page 3 there is a fairly sophisticated summary of the need for documentation for software. On page 4 Mr. Bennett got personnel out of bed to fix a tape machine. There was on page 10 a significant interface with the officer in charge to solve a problem involving the sea buoy array being in jeopardy and making a recommendation as to how to solve it. A notation that the ATD as a whole is accustomed to the panic mode in dealing with emergencies is on page 10. A recommendation for repairs is on page 10. A recommendation as to when to deploy made to the trial director is on page 12. A recommendation with respect to how the array was to be deployed is on page 14. A recommendation with respect to the types of hydrophones to be used is at page 15. And selecting the format for noise source test is on page 17. A conference with the trial director with respect to scheduling repairs is on page 22.

An interface with the ship's command to free a buoy is on page 22. A request to address the need for a new low frequency sphere is on page 23. A decision how long to wait before certain safety considerations would indicate deployment or use of emergency equipment is on page 24. A decision not to go ahead with calibration when the tape was probably not connected right is on page 41. A decision not to pull in an array when there was a problem with it because of the risk of causing more damage seemed apparent is on pages 47 and 50.

An example where the trial director relies on Mr. Bennett's recommendation about the number of people needed to go ahead with the trial is on page 48. And then an example that occurred several times; it goes back in time but it existed before and could exist again: A decision to jettison an entire dual array wherein Mr. Bennett said this was "my decision and my decision alone" is on page 67.

With respect to Mr. Hickman, Defendant's Exhibit 220, Mr. Hickman is responding to an array that was especially made up for the test on page 7. A decision to pull an array for repairs is on page 14. A decision that it was unnecessary to retrieve an array when he was given an option to retrieve it or not is on page 19. A situation where he was awakened to make some decision with respect to an emergency is on page 19. A situation where he requested

time of the trial director to investigate a problem with the array is on page 24.

All these decisions have implications on how the MONOB is going to accomplish its mission. They certainly implicate the timing, which is a very important consideration, and the provision of services and with what degree the services are going to be provided adequately or whether one is working with a quarter of one's resources or a half.

The Federal Personnel Manual requires that the duties as described to qualify for exemption must be primary duties. If the duties are under 50 percent of the time, they have to have certain requisites.

I believe that the duties of the individuals I have discussed represent their entire duties aboard the MONOB in terms of the maintenance, troubleshooting and interfacing functions. Although the facilities project manager is the primary source for interface, as I said, the trial reports reveal other occasions where individuals have just had to stand up and, as part of their job, do what is necessary to get the job done.

But to the extent that these duties do not describe half or more of the time taken up by plaintiffs' work, I believe that these duties qualify as "primary duty" under subparagraph B.1.a. 1–3 of the FPM. First, these kinds of judgmental and discretionary exercises are clearly exempt work. Secondly, they control the classification of the position. Finally, in terms of the two job descriptions I have reviewed of Mr. Bennett's and Mr. Hickman's duties for the cognizant period, these exercises of judgment and discretion represent the most important duty because they represent the height of exercising independent judgment and discretion.