Ronald L. BERG, Borre A. Schmidt,
and Dale T. Sturgill, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 95–748C.

United States Court of Federal Claims.

May 1, 2001.

Linda Lipsett, Bernstein & Lipsett, Washington, D.C., attorney of record for the plaintiffs. Jules Bernstein, of counsel, Bernstein & Lipsett, Washington, D.C.

Lee J. Freedman, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., with whom were Robert E. Kirschman, Assistant Director, David M. Cohen, Director, for the defendant. Warren A. Seidel, United States Air Force, of counsel.

**OPINION**

HORN, Judge.

**BACKGROUND**

Plaintiffs' claims stem from their employment as civilian GS–856–12 electronic technicians (ETs) in the Military Radar Unit, Space Positioning and Optical Range Tracking unit, located at Edwards Air Force Base, California. Edwards Air Force Base is a test facility for high performance aircraft. Plaintiffs seek backpay, liquidated damages, interest, attorney's fees, and costs pursuant to the overtime provisions of the Fair Labor Standards Act (FLSA) of 1938, as amended,

29 U.S.C. §§ 201–219 (1994). Prior to 1985, electronic technicians were GS–11s who received overtime pay under the FLSA. In 1985, the Office of Personnel Management (OPM) issued new regulations addressing eligibility for overtime. *See* 5 C.F.R. § 551.203(c) (1985) and discussion at *Am. Fed. of Gov't Employees v. OPM,* 821 F.2d 761, 769–70 (D.C.Cir.1987). As of March 1987, the plaintiffs' job positions had been reclassified as GS–12 positions and considered by the Air Force to be exempt from eligibility for overtime pay under the FLSA.

Ronald L. Berg worked as an electronic technician at Edwards Air Force Base from approximately January 1987 through August 1991. Borre A. Schmidt has worked as an electronic technician at Edwards from 1983 to the time of trial. Dale T. Sturgill has worked as an electronic technician from 1986 to the time of trial. Count one of the plaintiffs' first amended complaint alleges entitlement to overtime pay under the FLSA for hours worked in excess of forty hours each week. Count two of plaintiffs' first amended complaint alleges entitlement to various payments due under the FLSA, such as night shift differential and Sunday premium pay.

Plaintiffs first brought their overtime claims in federal district court. *See Berg et al. v. Newman,* No. CV–F–90–671 REC (E.D. Cal. June 19, 1991). Plaintiff's federal district court complaint, which was attached to the first amended complaint filed in the United States Court of Federal Claims, indicated that, pursuant to the Federal Employment Pay Act (FEPA), 5 U.S.C. § 5542(a)(2), the plaintiffs had received overtime pay, but at a rate limited to one and one-half times the GS–10, Step 1 rate of pay. Plaintiffs sought the higher overtime pay provided under the FLSA. Moreover, according to the district court opinion, in 1989, the Air Force's Director of Operations and Training had requested that non-supervisory electronic technician positions at Edwards Air Force Base be non-exempt from the FLSA, in other words eligible for FLSA overtime. The request was denied by the Air Force's classifier at Edwards Air Force Base under the administrative employee exemption. *Berg et al. v.*

*Newman,* No. CV–F–90–671 REC, order at 3 (E.D. Cal. June 19, 1991).

On cross motions for summary judgment, the United States District Court for the Eastern District of California found that plaintiffs were exempt from the FLSA, and, therefore, were not entitled to overtime benefits. *Id.* at 12. The federal district court, citing 29 U.S.C. § 207, noted that the FLSA provides for overtime compensation at one and one-half times the regular rate of pay, for hours worked beyond a forty hour work week. *Id.* at 2. The court, citing 29 U.S.C. § 213, also noted that employees are exempt from overtime provisions under the FLSA if they are employed "in a bona fide executive, administrative, or professional capacity." *Id.* The OPM regulations define these exempt categories. *See* 5 C.F.R. §§ 551.204 (executive exemption criteria), 551.205 (administrative exemption criteria), 551.206 (professional exemption criteria) (1985).

The federal district court in California reviewed OPM's description of an administrative employee, and agreed with the Air Force, finding the administrative exemption to be applicable. *Id.* at 10.

The pertinent regulations provide that:

An administrative employee is an advisor, assistance [sic], or representative of management, or a specialist in a management or general business function or supporting service who meets all of the following criteria:

(a) The employee's primary duty consists of work that—

(1) Significantly affects the formulation or execution of management policies or programs; or

(2) Involves general management or business functions or supporting services of substantial importance to the organization serviced; or

(3) Involves substantial participation in the executive or administrative functions of a management official.

(b) The employee performs office or other predominantly nonmanual work which is—

(1) Intellectual and varied in nature; or

(2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge.

(c) The employee must frequently exercise discretion and independent judgment, under only general supervision, in performing the normal day-to-day work.

5 C.F.R. § 551.205 (1987).

The federal district court concluded that:

In the instant case, plaintiffs functions consist of "supporting services of substantial importance to the organization services." They are responsible for the maintenance and repair of complex radar and communications equipment on which the air traffic controllers and military and commercial pilots rely. In addition, plaintiffs' positions require knowledge of computers, flight testing and its concomitant equipment and operational theory, and engineering procedures. Furthermore, the position description indicates that plaintiffs are not under constant supervision, but follow a predetermined work schedule with the exception of adjustments for priority or emergency situations. Such adjustments require plaintiffs to be able to work [sic] independent judgment and without direct supervision. Consequently, the court finds that plaintiffs positions fall within the administrative exemption to the overtime provisions of the FLSA.

*Berg et al. v. Newman,* No. CV–F–90–671 REC, order at 10 (E.D. Cal. June 19, 1991). In addition to finding that the plaintiffs fall within the FLSA exemption for administrative employees, and, therefore, are ineligible for overtime under the FLSA, the federal district court also found that the government was entitled to the "good faith" defense, which provides that:

[N]o employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay ... overtime compensation ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administration practice or enforcement policy of such agency.... Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

*Id.* at 5–6 (quoting 29 U.S.C. § 259). The federal district court determined that the Air Force properly applied OPM regulations then at 5 C.F.R. § 551.205 in deriving the administrative employee exemption to the FLSA, and acted in good faith. The government's motion for summary judgment was granted. *Id.* at 7–12.

Plaintiffs' appeal to the United States Court of Appeals for the Ninth Circuit was transferred to the United States Court of Appeals for the Federal Circuit on January 31, 1992 pursuant to 28 U.S.C. § 1295(a)(2) (1988). On December 28, 1992, the Federal Circuit reversed and remanded to the federal district court in California. *See Berg et al. v. Newman,* 982 F.2d 500, 501, 504–05 (Fed.Cir. 1992). On October 19, 1995, the case was transferred, on plaintiff's motion and without government opposition, from the United States District Court for the Eastern District of California to the United States Court of Federal Claims. In this court, the parties initially opted to proceed by means of cross-motions for summary judgment. At the conclusion of oral argument the court denied the cross-motions and the matter was set for trial to resolve the remaining material facts in dispute. A four day trial was held.

The United States Court of Appeals for the Federal Circuit had held that, "the record does not show as a matter of law that appellants are exempt from FLSA overtime benefits and because Government agencies may not rely on OPM regulations for a 'good faith' defense, this court reverses and remands." *Id.* at 501. The plaintiffs also had asked the Federal Circuit to reverse the lower court's denial of their motion for summary judgment, but the Circuit Court affirmed the denial, because plaintiffs' "classification under the administrative exemption

... requires the resolution of issues of material fact." *Id.* at 504.

Regarding the administrative employee exemption provisions from 5 C.F.R. § 551.205, quoted above, the Federal Circuit stated:

> This regulation requires an examination of the day-to-day work of an employee. To fit within the administrative exemption, an employee's day-to-day work must satisfy each of the three major regulatory touchstones: it must primarily involve or affect significant management responsibilities; it must involve nonmanual, intellectual or specialized duties; and it must demand frequent exercise of discretion and independent judgment.

*Id.* at 502. The Federal Circuit also highlighted and quoted from portions of FPM Letter 551–7:

> The United States Civil Service Commission (CSC), succeeded by OPM, issued Federal Personnel Manual (FPM) Letter No. 551–7 on July 1, 1975. This letter sets forth for *"Heads of [Federal] Departments and Agencies"* the "Instructions for Applying the Exemption Provisions of the [FLSA]." FPM Letter No. 551–7 elaborates on the administrative exemption's "general management or business functions or supporting services" as follows:
>
> > *General management, business, or supporting services:* This element brings into the administrative category a wide variety of specialists who provide general management, business, or other supporting services as distinguished from production functions. The administrative employees in this category provide support to line managers by:
> >
> > (1) Providing expert advice in specialized subject matter fields, such as that provided by management consultants or systems analysts;
> >
> > (2) Assuming facets of the overall management function, such as safety management, personnel management, or budgeting and financial management;
> >
> > (3) Representing management in such business functions as negotiating and administering contracts, determining acceptability of goods or services, or authorizing payments; or
> >
> > (4) Providing supporting services, such as automated data processing, communications, or procurement and distribution of supplies.

FPM Letter No. 551–7(B)(1)(h), July 1, 1975.[1] In addition, FPM Letter No. 551–7 describes certain groups of employees who do not fit any of the administrative exemption criteria:

> [N]onsupervisory employees at any grade level in occupations requiring highly specialized technical skills and knowledges [sic] that can be acquired only through prolonged job training and experience ... *unless* such employees are performing predominantly administrative functions rather than the technical work of the occupation.

FPM Letter No. 551–7(B)(2)(c), July 1, 1975.[2] This letter clarifies that technical skills alone do not make employees exempt. Rather, the administrative exemption applies to technical employees whose primary duties include specialized management consultation, overall management functions, contract negotiation and administration, and the like. To determine whether a position fits within the exemption, a trial court must have before it sufficient facts concerning the daily activities of that position to justify its legal conclusion.

*Id.* at 502–03. More specifically, the Federal Circuit noted that "appellants' technical expertise alone does not place them within the administrative exemption. *See Palardy v. Horner,* 711 F.Supp. 667, 670 (D.Mass.1989) (technical Navy employees not administratively exempt). Beyond technical expertise, the exemption requires day-to-day duties with other characteristics, such as significant

---

1. This portion of FPM Letter 551–7 was codified in substantially the same language at 5 C.F.R. § 551.104, in the January 1, 1998 edition of 5 C.F.R. Part 551. 62 Fed.Reg. 67247 (Dec. 23, 1997).

2. This portion of FPM Letter 551–7 was codified in substantially the same language at 5 C.F.R. § 551.202(e)(3), in the January 1, 1998 edition of 5 C.F.R. Part 551. 62 Fed.Reg. 67247 (Dec. 23, 1997).

managerial functions and frequent exercise of independent judgment." *Id.* at 503.

The Federal Circuit continued:

> The record does not suffice to show that appellants' day-to-day duties fall within the administrative exemption. The Government's evidence consists of appellants' job description and two conclusory statements from Air Force classifiers. The Government, however, presents no evidence describing appellant's specific job duties. The general job description lacks specific facts about appellants' day-to-day activities. Similarly, the Air Force classifiers supply little, if any, factual basis for their conclusions that appellants fit within the exemption. The record provides little, if any, evidence of appellants' supervisory or managerial functions on a daily basis. Nor does the record show that appellants' duties require frequent exercise of discretion and independent judgment.

*Id.* at 503. The Federal Circuit concluded that the government had not met its burden of proof, and that whether plaintiffs met the test for the administrative employees exemption required a review of disputed fact issues. *Id.* at 503.

## FINDINGS OF FACT

As noted above, the mission of Edwards Air Force Base is to flight test aircraft. The Military Radar Unit, in which the plaintiffs worked, is composed of both air traffic controllers and electronic technicians. The air traffic controllers support aircraft flying within the Edwards air space. According to the supervisor of the Military Radar Unit, Lonnie F. Mitchell, aircraft are provided "traffic, safety and boundary advisories within that designated air space ...." The electronic technicians maintain and repair the radar and communications equipment used by the air traffic controllers, pursuant to Federal Aviation Administration schedules and instructions.

At the time of trial, Mr. Mitchell had been the Branch Manager, or supervisor, of the Military Radar Unit at Edwards Air Force Base since November 1992. Mr. Mitchell's background is in air traffic control, and not in the electronic technician function. He schedules the electronic technicians, and performs other administrative, personnel, and management functions for the Military Radar Unit. In this regard, Mr. Mitchell is the approval authority for, and coordinates with, the base engineering and procurement offices on all hardware, software, and supply and equipment needs for the Military Radar Unit. All electronic technician generated needs are provided to Mr. Mitchell for "approval and signature."

*Ronald L. Berg*

Mr. Berg worked as a GS–12 at Edwards Air Force Base, between January 1987 and August 1991. As noted above, his unit contained both air traffic controllers as well as electronic technicians like Mr. Berg. Mr. Berg worked on automation, display, and communication equipment which the air traffic controllers used to display aircraft positions and to communicate with air crews and with each other. Mr. Berg and his fellow electronic technicians were tasked with keeping the equipment operational and in good repair. Mr. Berg's work, and that of the other plaintiffs, included a preventive maintenance schedule. Mr. Berg operated from Preventive Maintenance Intervals (PMIs), which described the test equipment needed, the step-by-step preventive maintenance tasks to be performed, and the frequency of the maintenance activities. Electronic test equipment included oscilloscopes, voltameters and telephone test sets, which, according to Mr. Berg, were used on average once or twice a week. If test equipment needed to be replaced, Mr. Berg reported that need to his supervisor, who would decide whether to procure the equipment or not, and would take the procurement action as necessary. When new parts were needed, Mr. Berg would pass the requirements on to one of the other electronic technicians for procurement action. On one occasion, Mr. Berg's supervisor directed him to work directly with procurement to obtain a desk top computer.

Mr. Berg certified that the equipment used by the air traffic controllers was operational, based on procedures prepared by others, and that he engaged in corrective maintenance as necessary by repairing equipment faults or malfunctions. Equipment was certified daily.

Technical manuals prepared by others provided step-by-step procedures to troubleshoot and repair equipment. Nonworking equipment would be restarted, repaired or replaced. Troubleshooting equipment faults occurred three or four times a month, and about eighty percent of the repair problems were recurring problems. The troubleshooting process took, on the average, about twenty minutes, and involved devising a strategy to identify the problem, following procedures on the troubleshooting chart or relying on past experience, and, if necessary, consulting with fellow electronic technicians on the problem. Forty to fifty percent of Mr. Berg's work day was spent on standby. During the standby time, when Mr. Berg first arrived at Edwards Air Force Base, he read technical manuals. After Mr. Berg became more experienced, ten to twenty percent of his standby time was devoted to reading the technical manuals.

Mr. Berg used soldering irons, wrenches, and screwdrivers in his troubleshooting and repair work, as well as in the preventive maintenance work discussed above, about five or six times a week. His uncontested estimate was that these tools were used to repair equipment eighty-five to ninety-five percent of the time. The repair work was usually performed at a work bench or on the floor. Mr. Berg also made configuration changes to the communication equipment, which consisted of adding or deleting a channel of communication by making changes to the current software and installing new communication switches. Mr. Berg testified that he performed none of the following functions at Edwards Air Force Base: budgeting, management of personnel, assignment of work to others, or planning and coordinating the installation of new equipment.

Mr. Berg was not certified by the Federal Aviation Administration as an electronic technician, but testified to having knowledge of "how electricity and electronic components work such as transistors, resistors, capacitors," which aided him in troubleshooting equipment faults. A college degree was not a requirement for the GS–856–12 electronic technician position. Mr. Berg received a Bachelor of Science degree in computer sci-

ence after leaving Edwards. Mr. Berg testified that he worked without direct supervision. His supervisor was not an electronic technician, and did not discuss with the plaintiff or the other electronic technicians how to repair equipment faults. Mr. Berg no longer works at Edwards, and is seeking FLSA overtime pay for the period during which he did.

*Dale T. Sturgill*

Mr. Sturgill began working at Edwards Air Force Base as a GS–11 electronic technician in 1986, and at the time of trial continued to work at Edwards at a GS–12 grade. His job as an electronic technician was to maintain and repair the equipment in the air traffic control system at Edwards, which was updated in 1994, and to make certain the system was operational at all times. Mr. Sturgill repaired equipment that failed, and certified the operational condition of the equipment and radar and communications systems. Mr. Sturgill performed preventive maintenance at scheduled intervals, and engaged in troubleshooting equipment defects. He has installed new equipment, overhauled equipment, and modified equipment, such as replacing components, under the direction of the FAA. He performed configuration changes, or modifications to systems, twenty or thirty times between 1997 and 1999, as tasked. He employed electronic testing to evaluate system performance and used tools in his work, such as screwdrivers, soldering irons, saws, drills, oscilloscopes, photometers, and signal generators. He used tools on most of his repair jobs. His uncontested testimony was that about ninety percent of the equipment problems he encountered were recurring problems, so that he was able to employ recurring troubleshooting procedures. He also performed preventive maintenance inspections, and certified the equipment and systems as operational. He performed communications changes at the direction of range control officers, which involved changing frequencies on a communications module.

Mr. Sturgill also served as his unit's equipment custodian, accounting for non-expendable equipment. He indicated that this function took less than a day each year. Mr.

Sturgill made recommendations on his unit's equipment needs, and interfaced with the base procurement office to secure supplies and equipment. Over a six or seven year period, he estimated that he ordered only about eight pieces of equipment. From 1987 to the time of trial, about fifty percent of his working hours was standby time, during which he read the newspaper, technical manuals and equipment manuals, and did homework. He was required to remain on base in the work area during the standby time. During standby, Mr. Sturgill was awaiting equipment or system problems to arise, which required corrective action.

Mr. Sturgill testified that did not identify equipment or system design deficiencies; act as a project manager on a communication system procurement, modification, or upgrade; evaluate technical proposals; develop new procedures for certification plans; perform engineering studies; perform a budgeting function; or assign work to others. He attended meetings for purposes of coordination on projects, essentially as a point of contact, but did not, in his view, act as a program manager on any of the projects. His work was largely governed by technical manuals, directives, specifications, instructions, check lists, and procedures from which he did not deviate. He assisted in the drafting of a PMI manual for a Litton–Amecom system, but relied on the manufacturer's data to do so. Mr. Sturgill noted that electronic technicians drafted other similar manuals, again relying on manufacturer data.

Mr. Sturgill attended two months of formal training at the Federal Aviation Administration Academy in Oklahoma City, and has been certified by the FAA as an electronic technician. He also attended a ten day Technician Maintenance Course for the Litton–Amecon ICSS Type II (Communication) System, and other technical courses, which included training on missile electronics repair, electronic theory, the Integrated Flight Data Processing System, a Processing System Maintenance class, Quality Control Procedures, Radar Introduction, a System Acquisition/Test and Evaluation course, the Z80–80 Microprocessor, Aircraft Arresting Barrier, Laser Tracking System, Basic Elec-

tronics, and Beginning WordStar. He possesses enough college credits for an Associate in Science degree in electronics, but has not actually obtained the degree. He possesses knowledge of computers, software, communications equipment, instrumentation test apparatus, and electronic circuitry, and has applied his training to the troubleshooting function at Edwards Air Force Base.

Mr. Sturgill acknowledged that he works independently, without direct supervision, and uses personal initiative to accomplish his work. He has briefed his supervisor on the status of equipment which could not be repaired immediately, and has had contacts in his work with other base personnel such as range control officers, who are in charge of the flight test mission at Edwards, the engineering department, procurement specialists who purchase test equipment and computers for the electronic technicians, and contractor and fellow government electronic technicians, while troubleshooting equipment and systems.

*Borre A. Schmidt*

At the time of the trial, Mr. Schmidt had been employed at Edwards Air Force Base as an electronic technician since 1983. He began as a GS–11, non-exempt from the FLSA, and, therefore, eligible for FLSA overtime. He testified that he became a GS–12 in December 1986. He performed essentially the same duties as the other plaintiffs, maintaining and repairing the air traffic control system at Edwards. He performed maintenance on the radar and communications system, using electronic test equipment, repaired system faults, certified systems as meeting FAA operational requirements and standards, modified equipment by installing components pursuant to step-by-step instructions, developed PMIs for three systems, relying on manufacturers' manuals, taking between twelve and two hundred hours for each PMI, interfaced with the range engineering group on twenty or thirty requests for assistance to the engineers, consuming a total of between twenty and thirty hours, served as a supply custodian, interfaced with contractor personnel installing systems, and coordinated communication system procurements. Mr. Schmidt testified that he did not deviate from

prescribed FAA certification procedures. He used soldering irons, wrenches, and screwdrivers regularly, at least two or three times a week.

By his estimate, Mr. Schmidt spent, on average, approximately sixty to sixty-five percent of his worktime on standby, awaiting system failures requiring corrective action. During standby, Mr. Schmidt monitored system status displays. Mr. Schmidt testified that he did not identify potential equipment design deficiencies, fine tune new equipment, evaluate technical proposals for new equipment, develop acceptance certification plans for new range systems, develop software modifications, develop engineering studies, interface with equipment manufacturer representatives, perform budgeting functions, or manage personnel.

He attended the two month formal FAA Academy training in Oklahoma City. He also has taken two courses of five days duration, each on the maintenance of specific radar systems. He has knowledge of communications equipment, computers and computer software, and considers himself a technical expert in his work assignment area. Mr. Schmidt does not confer with his supervisor for assistance in performing troubleshooting or other work, but does provide equipment status updates to his supervisor as necessary. He acknowledges that he worked independently without direct supervision.

*The FLSA Exemption at Edwards Air Force Base*

The plaintiffs' electronic technician work and position description were reviewed by classification personnel at Edwards Air Force Base in 1986. At the time of the trial, Sharon L. Quick testified that she was the Chief of Human Resources at Edwards. She has completed an OPM position classification course, and was trained on the job under experienced classifiers. Ms. Quick, as a classifier, reviewed the plaintiffs' electronic technician positions, and, on December 19, 1986 classified, or graded, the positions at the GS–12 level pursuant to OPM classification standards for the 856 series. Ms. Quick testified that:

[T]he 856 standard only goes up to a GS 11 level. So in order to get to a 12 level you have to find that the position is equivalent to an engineering position, and unless you find that equivalency you cannot obtain the 12 level. One of the things that I did in this particular case is I went to the FAA single agency standard, I obtained that standard, and I used that in my audit to determine that indeed these positions were equivalent to the work that was performed by the technicians for the FAA.

Ms. Quick concluded that the electronic technicians "apply the theory and principles of electronics. They are not simply wrench turners. They have to know how these pieces of equipment operate in order to keep them in an operational state at all times. It's not a matter of simply following an instruction. They must use judgment in order to do that." On whether the reclassified positions were exempt from the FLSA, Ms. Quick testified that she consulted FPM Letter 551–7, "Instructions for Applying the Exemptions Provisions of the Fair Labor Standards Act (FLSA)," dated July 1, 1975. She concluded that the plaintiffs' electronic technician positions were FLSA exempt because, tracking the definitions in 5 C.F.R. § 551.205 and FPM Letter 551–7, the primary duty involves work that significantly affects the execution of the mission; the work is predominantly nonmanual, and requires specialized training, experience, and knowledge; and the electronic technicians, in normal day-to-day work, frequently exercise discretion and independent judgment, under only general supervision.

## DISCUSSION

The FLSA provides that employees who work more than forty hours per week shall receive overtime pay at a rate not less than one and one-half times the employees' normal pay. 29 U.S.C. § 207(a) (1994). The FLSA's overtime provisions apply to civilian employees of the military departments, such as the plaintiffs. 29 U.S.C. § 203(e)(2)(A)(i) (1994). The overtime provisions, however, do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity ...." 29 U.S.C.

§ 213(a)(1) (1994). Defendant contends that the administrative exemption applies to the plaintiffs. The OPM regulations provide that employees are presumed to be non-exempt, and, therefore, eligible for FLSA overtime pay, 5 C.F.R. § 551.202(a) (1998), and that exemption criteria shall be "narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption." 5 C.F.R. § 551.202(b). Only an employee who "clearly meets the criteria for exemption," is ineligible for FLSA overtime pay. 5 C.F.R. § 551.202(d). The burden of proof rests with the agency asserting the exemption. 5 C.F.R. § 551.202(c) (for a discussion of the OPM regulations *see also Berg et al. v. Newman,* 982 F.2d at 501–03; *Aamold v. United States,* 39 Fed.Cl. 735, 739, 746 (1997)).

FLSA exempt or nonexempt status "rests on the duties actually performed by the employee." 5 C.F.R. § 551.202(i) (1998); *see also Berg et al. v. Newman,* 982 F.2d at 502, 503. The OPM definition of worktime elaborates: *"Worktime,* for the purpose of determining FLSA exemption status, means time spent actually performing work. This excludes periods of time during which an employee performs no work, such as standby time, sleep time, meal periods, and paid leave." 5 C.F.R. § 551.104 (1998) (emphasis in original). The regulations also state that *"[p]rimary duty* typically means the duty that constitutes the major part (over 50 percent) of an employee's work."[3] 5 C.F.R. § 551.104 (1998) (emphasis in original); *see also* the FPM Letter 551–7, attachment 1, paragraph B.1.a., July 1, 1975.

As noted earlier, the pertinent OPM regulations provide that an administrative em-

ployee, exempt from overtime eligibility under the FLSA, is an:

[A]dvisor or assistant to management, a representative of management, or a specialist in a management or general business function or supporting service and meets all four of the following criteria:

(a) *Primary duty test.* The primary duty test is met if the employee's work—

(1) Significantly affects the formulation or execution of management programs or policies; or

(2) Involves management or general business functions or supporting services of substantial importance to the organization serviced; or

(3) Involves substantial participation in the executive or administrative functions of a management official.[4]

(b) *Nonmanual work test.* The employee performs office or other predominantly nonmanual work which is—

(1) Intellectual and varied in nature; or

(2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge.

(c) *Discretion and independent judgment test.* The employee frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work.

(d) *80–percent test.* In addition to the primary duty test that applies to all employees, General Schedule employees in positions properly classified at GS–5 or GS–6 (or the equivalent level in other comparable white-collar pay systems) must spend 80 percent or more of the worktime in a representative workweek on adminis-

---

**3.** A duty which constitutes less than fifty percent of an employee's work can be the primary duty, provided that the duty:

(1) Constitutes a substantial, regular part of a position;
(2) Governs the classification and qualification requirements of the position; and
(3) Is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment, and the significance of the decisions made.

5 C.F.R. § 551.104 (1998); *see also* FPM Letter 551–13, "Use of Supervisory Classification Stan-

dards in Making Executive Exemption Determinations Under the Fair Labor Standards Act (FLSA)," dated Feb. 21, 1978, which added amendments to FPM Letter 551–7, attachment 1, paragraph B.1.a., July 1, 1975. The court has not employed this alternative, or expanded, definition of primary duty.

**4.** Defendant has not argued that the plaintiff's work involves substantial participation in the executive or administrative functions of a management official. In the case before this court, element (a)(3) of the primary duty test is not applicable and will not be addressed below.

trative functions and work that is an essential part of those functions to meet the 80–percent test.[5]

5 C.F.R. § 551.206 (1998).[6] As indicated by the language of the OPM regulation, all three remaining tests must be met in order for an employee to be declared exempt: (a) the primary duty test, (b) the nonmanual work test, and (c) the discretion and independent judgment test. *Id.*; *Berg et al. v. Newman*, 982 F.2d at 502. Each is discussed below.

*Primary Duty Test*

■ The evidence demonstrates that the primary duties of the electronic technicians in the Military Radar Unit at Edwards Air Force Base were to maintain, repair, and certify equipment as operational in support of the flight test mission. The evidence also reflects that the majority, or over fifty percent of the actual worktime of each of the plaintiffs is spent keeping the operating systems in repair by performing preventive maintenance checks according to developed step-by-step procedures, maintaining, troubleshooting, repairing, installing, modifying, and certifying equipment in support of air traffic control and flight testing at Edwards. The evidence also reflects that plaintiffs' other functions consume far less than fifty percent of their work, including identifying the need for and obtaining supplies and equipment, with supervisory approval and base procurement office assistance; equipment custodian functions; drafting compliance or procedural manuals based on manufacturer supplied data; and interfacing with other base personnel, such as acting as a point of contact for the Military Radar Unit in meetings. These functions are secondary to the primary duties of each of the plaintiffs, and consume relatively little worktime compared to the primary duties, described above.

A large percentage of the workday for all three plaintiffs was standby time, with the electronic technicians required to remain at duty stations, in order to respond to equipment failures if they should occur. Mr. Berg estimated that forty to fifty percent of his time at work was standby time; Mr. Sturgill estimated fifty percent of his time; and Mr. Schmidt estimated sixty to sixty-five percent of his time. As noted earlier, standby time is not counted in the OPM regulations as worktime, even when standing by, as in this case, to perform the primary duties of maintaining and repairing equipment. 5 C.F.R. § 551.104.

*Execution of Management Programs*

Defendant argues that the plaintiffs' primary duties significantly affect the execution of management programs, *see* 5 C.F.R. § 551.206(a)(1), and also involve supporting services of substantial importance to the organization, *see* 5 C.F.R. § 551.206(a)(2). Either function is sufficient to meet the primary duty test. Defendant has not argued, and, given the evidence in the record, cannot prove that any of the plaintiffs substantially participated in the executive or administrative functions of a management official. *See* 5 C.F.R. § 551.206(a)(3). In support of its argument, defendant notes the criticality of the electronic technician jobs, citing Mr. Berg's testimony that malfunctioning equipment, which the electronic technicians maintain and repair, could result in the "costly repeat of flight tests or in some cases loss of aircraft and aircrew." Defendant also cites Mr. Schmidt's testimony, acknowledging that his work required "[c]areful attention to accomplish the needed work, with an absolute minimum amount of disruption to service normally provided in support of mission accomplishment." Defendant argues that 5 C.F.R. § 551.205(a)(1) is satisfied, because "the plaintiffs' roles significantly affect the execution of the program and are of a substantial importance to the organization serviced. If the Edwards Air Force Base electronic technicians do not perform their jobs correctly, it can have a direct, and possibly dire, impact upon the success of flight test missions." Defendant, therefore, concludes that the primary duties of the plaintiffs are

---

5. The provisions at section 551.206(d) pertain to GS–5 and GS–6 personnel and, also, are not applicable to the present case.

6. Section 551.205, quoted verbatim by the United States Court of Appeals for the Federal Circuit in *Berg et al. v. Newman,* 982 F.2d at 502, and earlier in this opinion, was recodified, in substantially the same language, at 5 C.F.R. § 551.206 (1998). Hereafter, the more recent reference, section 551.206, will be employed.

critical to the mission of Edwards Air Force Base.

The first OPM test is whether the employee's work significantly affects the "execution of *management* programs ...." 5 C.F.R. § 551.206(a)(1) (emphasis added). This concept is defined in the OPM regulations:

> Employees significantly affect the execution of management programs or policies typically when the work involves obtaining compliance with such policies by other individuals or organizations, within or outside of the Federal Government, or making significant determinations furthering the operation of programs and accomplishment of program objectives. Administrative employees engaged in such work typically perform one or more phases of program management (that is, planning, developing, promoting, coordinating, controlling, or evaluating operating programs of the employing organization or of other organizations subject to regulation or other controls).

5 C.F.R. § 551.104. Defendant's critical-to-the-mission argument does not take into account that the above OPM definition is referring to *management* policies or programs. While plaintiffs' work may be crucial to the success of the flight test mission, defendant has not demonstrated that the work is crucial to the successful *management* of Edwards Air Force Base. In addition, the evidence does not reflect the plaintiffs' involvement in "obtaining compliance ... by other individuals or organizations," nor do plaintiffs make "significant determinations" with regard to Edwards Air Force Base programs. In addition, plaintiffs do not engage in the enumerated phases of program management in their primary work. Plaintiffs primary work is not, for example, a planning, development, promotion function, or any of the other management functions included in the OPM definition. Defendant cites the OPM definition of the "execution of management programs," but omits from the definition the phases of program management, and does not attempt to explain how the OPM definition is met. Criticality of the job to the mission is not the thrust of the test; relation of the work to one

or more phases or functions of program management is the key.

The United States Court of Appeals for the Federal Circuit in *Berg et al. v. Newman,* providing guidance for this court's review in the present case, noted that technical expertise alone does not place the plaintiffs within the administrative exemption and that significant managerial functions are required. *Berg et al. v. Newman,* 982 F.2d at 503. The Federal Circuit also cited the *Palardy* case in this regard. The plaintiffs in *Palardy v. Horner,* 711 F.Supp. at 668, performed technical tasks relating to the repair, testing, and overhaul of naval ship equipment and systems. The federal district court concluded that the government had failed to carry its burden to demonstrate that the plaintiffs were within the administrative exemption. "Plaintiffs neither make nor implement policy. Their role is limited to performing technical tasks to assure that naval ship systems and equipment is properly designed, repaired, tested and overhauled." *Id.* at 670. According to the *Palardy* court, "[t]he work is practical rather than theoretical, and does not require an advance course of academic study. Rather, the skills needed to perform all assigned tasks are obtained through on the job training." *Id.* at 668–69 (footnote omitted). For the same reasons, the court finds that the plaintiffs' technical work, in the present case, does not significantly affect the execution of management policies or programs.

*Supporting Services*

Defendant also argues that the plaintiffs' primary work involves supporting services of substantial importance, and, therefore, places the plaintiffs within the administrative exemption. 5 C.F.R. § 551.206(a)(2). Defendant's theory relies, again, on the criticality of the function, with electronic technicians "vigilantly maintaining, repairing, troubleshooting, and upgrading the equipment relied upon by the air traffic controllers. Thus, the ETs are of substantial importance to insuring mission accomplishment." Once again, however, OPM has provided a definition of supporting services for the agency and the court to apply:

*Management or general business function or supporting service,* as distinguished from production functions, means the work of employees who provide support to line managers.

(1) These employees furnish such support by—

(i) Providing expert advice in specialized subject matter fields, such as that provided by management consultants or systems analysts;

(ii) Assuming facets of the overall management function, such as safety management, personnel management, or budgeting and financial management;

(iii) Representing management in such business functions as negotiating and administering contracts, determining acceptability of goods or services, or authorizing payments; or

(iv) Providing supporting services, such as automated data processing, communications, or procurement and distribution of supplies.

5 C.F.R. § 551.104 (1998) (emphasis in original); *see also Berg et al. v. Newman,* 982 F.2d at 502.

Defendant argues that the plaintiffs' primary duty satisfies "at least two of the enumerated prongs [of the above definition]." The defendant argues that the OPM definition of supporting services is satisfied by the plaintiffs because the electronic technicians "provide support services by identifying the need for test equipment ... and by ordering necessary parts." Such duties, however, represented a relatively small portion of the plaintiffs' worktime. Mr. Berg, for example, would let his supervisor know when test equipment he used needed to be replaced. When new parts were needed, Mr. Berg passed the requirement on to others for procurement action. The evidence reflected only a single occasion when Mr. Berg was instructed by his supervisor to work directly with the procurement office to obtain a desktop · computer. Mr. Sturgill served as his unit's equipment custodian, a function he testified only took less than a day each year. Mr. Sturgill also made recommendations on equipment needs, and worked with the procurement office to secure supplies and equip-

ment. Over a six or seven year period, however, Mr. Sturgill recalled ordering only about eight pieces of equipment. Mr. Schmidt also served as the equipment custodian prior to turning the extra duty over to Mr. Sturgill. The evidence reflects that the function of identifying equipment needs and parts occupied a small part of the actual worktime of the plaintiffs, and could not be characterized as the plaintiffs' primary duties.

Defendant also argues that "plaintiffs testified to providing technical advice in some form," in an attempt to identify support services qualifying for the administrative exemption. Mr. Berg testified that about once a month he would discuss with his direct supervisor the status of equipment repair. Mr. Berg also testified that on one occasion he discussed the technical capabilities and desirable features for a computer acquisition. Mr. Sturgill similarly briefed his supervisor on the status of equipment which could not be repaired immediately. He also attended meetings for purposes of coordination on the replacement of the air traffic control system, and made recommendations for the selection of video reproduction equipment. During the period 1990—1994, Mr. Schmidt was the point of contact for the Military Radar Unit for the new radar system, a role he variously estimated to have consumed 30 to 80 hours each year. The evidence does not reflect that providing technical advice was a primary duty for any of the plaintiffs, but appears to have been intermittent and infrequent.

In *Adam v. United States,* 26 Cl.Ct. 782 (1992), the duties of Senior Border Patrol Agents of the Immigration and Naturalization Service (INS) were found not to fall within the administrative exemption, and, as a result, the agents were eligible for FLSA overtime pay. *Id.* at 783, 794. Border patrol agents police the nation's borders to prevent the illegal entry of aliens into the country. *Id.* 784. Though senior agents, the positions in question were nonsupervisory. *Id.* The court in *Adam* noted that "employees covered by the administrative exemption perform management or staff functions and are not front-line production workers." *Id.* at 787. The court concluded that "[p]rosecuting

violators of the immigration laws directly involves performance of an INS mission and thus is a line function of INS." *Id.* at 788. The border patrol agent's primary duty was not deemed to be supporting services, but was considered a production function. *Id.* at 789, 791, 792. As in *Adam*, the issue in the present case is whether the plaintiffs' primary duty is in the nature of supporting services or is a production function.

The Claims Court in *Adam* distinguished and rejected the conclusion to withhold overtime pay in *Campbell*, a federal district court case which involved air traffic control specialists seeking overtime pay under the FLSA. The *Adam* court noted that the court in *Campbell* relied on the principal function of flying, as distinct from the support function of the air traffic control specialists, and that the air traffic control work was nonmanual work. *See id.* at 789–90. In *Campbell*, the district court found the air traffic controllers exempt from the FLSA, as providing aircraft and mission control services, suggesting perhaps that each air traffic controller is to be considered a manager of air traffic services. *Campbell v. United States Air Force*, 755 F.Supp. 893, 896 (E.D.Cal.1990).[7] The *Adam* court concluded that, unlike the *Campbell* court's view of air traffic controllers, the senior border patrol agents "perform the end function itself," or the production function, rather than supporting services of significant importance. *Adam v. United States*, 26 Cl. Ct. at 790. The District of Columbia District Court, in *Roney*, also distinguished the *Campbell* case. The *Roney* district court noted that *Campbell's* air traffic controllers rarely performed any manual work and that their work environment is that of a so-called "white collar office worker," unlike the *Roney* plaintiff, a Deputy United States Marshall, who was found eligible for overtime pay. *Roney v. United States*, 790 F.Supp. 23, 28 (D.D.C.1992).

The Claims Court in *Adam* also distinguished *Hickman v. United States*, 10 Cl.Ct. 550 (1986), a Claims Court case involving an electronics technician, the same duty title held by the plaintiffs in this case, but performing different functions, and a computer equipment analyst, both working for the Navy, because the plaintiffs in *Hickman* provided expert advice on specialized subject matter fields. *Adam v. United States*, 26 Cl.Ct. at 790. In *Hickman*, the court determined that the data processing function provided by both plaintiffs was a supporting service rather than a production function. *Id.* at 558 ("[T]he provision of accurate and valid data is a service. Data processing itself has always been determined in any context to be a service and not a production of any item such as the hardware itself.") The *Hickman* court relied in part also on the exercise of independent discretion and independent judgment by the plaintiffs and the nonmanual nature of the work. *Id.* at 559, 560–61. The court in *Adam* noted that FPM Letter 551–7 specifically listed data processing as an administrative support function, and distinguished *Hickman* by concluding that the senior border patrol agents in *Adam*, by way of contrast to data processors, were performing a production function. *Adam v. United States*, 26 Cl.Ct. at 790 (citing FPM Letter 551–7, attachment 1, paragraph B.1.h.(4), at 9, codified at 5 C.F.R. § 551.104).

The primary duty of the plaintiffs in the present case does not include data processing, or other supporting management or administrative services. The production mission at Edwards Air Force Base is flight testing, and the plaintiffs, who maintain and repair the equipment necessary for that function, are an integral part of production. Plaintiffs' work does not fit within the criteria of 5 C.F.R. § 551.205(a)(2). *See Aamold v. United States*, 39 Fed.Cl. at 745–47 (sur-

---

**7.** Although the *Campbell* case was distinguished in *Adam*, discussed above, *Campbell* was cited with approval in another case, *Adams v. United States*, 27 Fed.Cl. 5, 15 (1992), *motion to vacate denied*, 38 Fed.Cl. 572 (1997). On appeal to the United States Court of Appeals for the Federal Circuit, *Adams* was reversed and remanded to permit evaluation of the claimants' day-to-day activities, similar to the direction in *Berg et al. v.*

*Newman*, 982 F.2d at 502–03. *See Adams v. United States*, 178 F.3d 1306 (Fed.Cir.1998) (table). While the case was pending on appeal, the parties in *Campbell* settled, the United States Court of Appeals for the Federal Circuit vacated the district court's order, and the case was dismissed. *Campbell v. United States Air Force*, 972 F.2d 1352 (Fed.Cir.1992) (table).

**472**

veying cases which distinguished between the production function and supporting services); *Adam v. United States,* 26 Cl.Ct. at 788 (employees covered by the administrative exemption perform management or staff functions and are not front-line production workers; "only those positions that 'significantly affect,' i.e., influence or change, the execution of policy ... are exempt."); *Roney v. United States,* 790 F.Supp. at 27 ("The service that the [United States] Marshals provide for the courts does not relate to security policy or operational management but rather to the application of security measures to the day-to-day production process of a working courtroom."). *Cf.* also United States Department of Labor private sector cases to the above cited cases operating under the OPM rules: [8] *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 903–04 (3rd Cir.1991) (the concept of production in Department of Labor regulations is not limited to production on a manufacturing line), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992); *Bell v. Farmers Ins. Exch.,* 87 Cal.App.4th 805, 105 Cal.Rptr.2d 59 at 70–71 (2001) (in a private sector case, the court rejected the argument that production only applies to manufacturing, and quoted *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1230 (5th Cir.1990), which draws a distinction "between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the ... goods or services, that the enterprise exists to produce and market." (footnote omitted)), *reh'g denied* (Mar. 29, 2001); *Scott Wetzel Servs. Inc. v. New York State Bd. of Indus. Appeals,* 682 N.Y.S.2d 304, 305, 252 A.D.2d 212, 214 (1998) ("In applying this production/administrative dichotomy [in this private sector case], it is necessary to identify the nature of

the employee's business to ascertain whether the employee's job is to produce the product or services the employer's business offers to the public or whether the employee is engaged in servicing the business by performing such tasks as advising management, planning, negotiating, representing the company, purchasing, promoting sales and business research and control...." (citations omitted)); *Reich v. American Int'l Adjustment Co.,* 902 F.Supp. 321, 325 (D.Conn.1994) (private sector automobile appraisers were nonexempt, for "[r]ather than administratively running the business, they carry out the daily affairs of [the company].").

In the case currently before the court, the plaintiffs' primary duties are not managerial or administrative. Tracking the OPM definition of managerial function and supporting services, the plaintiffs, in their primary duty, do not act as management consultants or systems analysts; do not engage in overall management functions, such as safety management, personnel management, or financial management; do not serve as representatives of management, such as in negotiating or administering contracts; and do not provide management or administrative supporting services. *See* 5 C.F.R. § 551.104. Focusing on their primary duties, the plaintiffs are technical employees who perform important jobs at Edwards Air Force Base, but who do not perform specialized management or administrative functions. *See Berg et al. v. Newman,* 982 F.2d at 502–03 ("[T]he administrative exemption applies to technical employees whose primary duties include specialized management consultation, overall management functions, contract negotiation and administration, and the like."); *Adam v. United States,* 26 Cl.Ct. at 789 ("The obvious intent [of the OPM regulations] is to identify

---

**8.** *See Adam v. United States,* 26 Cl.Ct. at 786 ("[T]he DOL regulations can be used to shed light on the [FLSA]. Other than the statute itself, the OPM regulations are obviously the first point of reference that federal employers must use in implementing the FLSA. But in construing those regulations, the court is not barred, but rather is encouraged to consider the DOL's regulations and other interpretations of the [FLSA]. Although the OPM regulations are presumptively controlling, both sets of regulations are of value to the court.... [W]e believe the Labor Department materials provide guidance helpful to our

construction of not only the FLSA, but also the OPM regulations.)." Accord *Aamold v. United States,* 39 Fed.Cl. at 739 n. 4 ("OPM's regulations and interpretations must be consistent with the FLSA itself and with the standards set by DOL for the private sector. *See Lanehart v. Horner,* 818 F.2d 1574, 1578 (Fed.Cir.1987). While OPM regulations are controlling and are entitled to great deference, *see Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 798, 13 L.Ed.2d 616 (1965), the court also can consider DOL's regulations. *See American Fed'n of Gov't Employees v. OPM,* 821 F.2d 761, 769–71 (D.C.Cir.1987).").

persons performing management or business functions.").

The Federal Circuit in *Berg* cited the attachment to FPM Letter 551–7, in emphasizing that even very specialized technical workers are normally FLSA exempt. *Berg et al. v. Newman,* 982 F.2d at 502. The FPM Letter states:

> (e) There are groups of General Schedule employees who are FLSA nonexempt because they do not fit any of the exemption categories. These groups include the following:
>
> &ast; &ast; &ast;
>
> (3) Nonsupervisory General Schedule employees at any grade level in occupations requiring highly specialized technical skills and knowledges [sic] that can be acquired only through prolonged job training and experience ... unless such employees are performing predominantly administrative functions rather than the technical work of the occupation.

5 C.F.R. § 551.202(e)(3); *see also* FPM Letter No. 551–7, attachment 1, paragraph B.2.c. The defendant must rely on something more than plaintiffs' critical-to-the-mission, technical skills to justify denying overtime benefits. Plaintiffs must have predominantly performed administrative functions, and they have not. The court finds that the defendant has not demonstrated that plaintiffs' work falls within the requirements of 5 C.F.R. § 551.205(a)(1) or (a)(2), and has failed to satisfy the primary duty test. Defendant, therefore, has failed to carry its burden to demonstrate that the plaintiffs fall within the administrative exemption, for defendant must meet all three of the applicable tests—the primary duty test discussed above, the nonmanual work and the discretion and independent judgment tests discussed below. *See* 5 C.F.R. § 551.206. For the purpose of completeness, the court will examine the remaining two tests.

*Nonmanual Work Test*

The second test for an administrative exemption from the FLSA provides that an "employee performs office or other predominantly nonmanual work which is—(1) Intellectual and varied in nature; or (2) Of a specialized or technical nature that requires considerable special training, experience, and knowledge." 5 C.F.R. § 551.206(b).

*Office or Other Nonmanual Work*

Defendant argues that the plaintiffs' "primary duties and responsibilities, as outlined in the electronic technicians' position descriptions and testified to by the plaintiffs, do not involve manual labor but rather reflect a clear emphasis upon activities which call for the electronic technicians to rely upon their expertise with, and knowledge of, the equipment to ensure the proper functioning of the systems." Defendant also suggests that the plaintiffs' classification at the GS–12 level stemmed from performing work which was equivalent to journeyman level engineers, and that plaintiffs' work is "predominantly office or nonmanual by virtue of the fact that it was equivalent to engineering work."

Mr. Berg testified that once or twice a week he used test equipment such as oscilloscopes, voltameters, and telephone test sets. About five or six times a week he used soldering irons, wrenches, and screwdrivers, and used these tools to repair equipment about eighty-five to ninety-five percent of the time. The repair work was usually performed at a work bench or on the floor. Mr. Sturgill similarly testified that he used screwdrivers, soldering irons, saws, drills, oscilloscopes, photometers, and signal generators on most of his repair jobs. Mr. Schmidt testified that he used soldering irons, wrenches, and screwdrivers regularly, at least two or three time a week. In addition, plaintiffs drew the court's attention to the manual work involved in PMI inspections. For example, the PMI for the Integrated Communications Switching System includes the following instructions: vacuum the interior and exterior areas of each cabinet, clean exterior surfaces with detergent, check connecters, and replace burned out indicator lamps.[9]

9. Materials specified in the PMI include a vacuum cleaner, detergent, shop towels, and glass cleaner.

OPM regulations do not define the phrase "nonmanual work," but Department of Labor regulations do, and have been cited as guidance:

(a) The requirement that the work performed by an exempt administrative employee must be office work or nonmanual work restricts the exemption to "white-collar" employees who meet the tests. . . .

(b) . . . if the employee performs so much manual work (other than office work) that he cannot be said to be basically a "white-collar" employee he does not qualify for exemption as a bona fide administrative employee, even if the manual work he performs is directly and closely related to the work requiring the exercise of discretion and independent judgment. Thus, it is obvious that employees who spend most of their time in using tools, instruments, machinery, or other equipment, or in performing repetitive operations with their hands, no matter how much skill is required, would not be bona fide administrative employees. . . .

*Adam v. United States*, 26 Cl.Ct. at 793 (quoting 29 C.F.R. § 541.203 (1991)) (finding that senior border patrol agents were not white-collar office workers, and were not subject to the administrative exemption from the FLSA). Plaintiffs spend the majority of their actual worktime maintaining and repairing equipment with testing equipment, tools and cleaning supplies, working off floors and work benches, and following instruction manuals. These activities are not of the type ordinarily associated with desk-bound, "white-collar" employees. The defendant has failed to demonstrate that the plaintiffs perform office or other predominantly nonmanual work, and, therefore, cannot demonstrate that plaintiffs are exempt from the FLSA under the administrative exemption.

### Intellectual and Varied in Nature

The defendant also argues that plaintiffs' work was intellectual in nature: "Troubleshooting and problem solving requires perceptiveness, analytical reasoning, perspective and judgment applied to numerous variables—all hallmarks of work of an intellectual nature." As for being varied in nature, defendant argues that the plaintiffs have worked on a variety of tasks, such as developing and improving procedures, documenting action taken on equipment, developing modifications on equipment, drafting compliance manuals, and coordinating on a variety of matters with other personnel.

OPM regulations define work of an intellectual nature as:

[W]ork requiring general intellectual abilities, such as perceptiveness, analytical reasoning, perspective, and judgment applied to a variety of subject matter fields, or work requiring mental processes which involve substantial judgment based on considering, selecting, adapting, and applying principles to numerous variables. The employee cannot rely on standardized application of established procedures or precedents, but must recognize and evaluate the effect of a continual variety of conditions or requirements in selecting, adapting, or innovating techniques and procedures, interpreting findings, and selecting and recommending the best alternative from among a broad range of possible actions.

5 C.F.R. § 551.104; *see also* FPM Letter No. 551-7, attachment 1, paragraph B.1.j. The evidence reflects that plaintiffs relied largely on the "standardized application of established procedures," using the language of the above OPM definition. PMIs, for example, established periodic, specific, and step-by-step procedures. PMIs listed the test equipment, tools and supplies needed, and the specific procedures to follow. Daily equipment certification was pursuant to step-by-step procedures and FAA standards. Equipment calibration was performed pursuant to specific procedures. Troubleshooting equipment faults and repair work also were performed in accordance with procedures set out in manuals and standardized diagnostic procedures.

Rather than having to "recognize and evaluate the effect of a continual variety of conditions or requirements in selecting, adapting, or innovating techniques and procedures," in the language of the OPM definition, the preventive maintenance procedures were routine, and even the troubleshooting performed by the electronic technicians was for recur-

ring faults. Mr. Berg testified, for example, that the particular equipment problems would recur at least eighty percent of the time. Mr. Sturgill put the recurring problems percentage at ninety percent, and Mr. Schmidt at eighty percent.

In attempting to identify work of an intellectual nature, defendant points to "unprecedented situations" which the plaintiffs must handle, such as "the power go[ing] out when the shuttle was landing." However, the space shuttle landing was the only unprecedented situation testified to by Mr. Berg. Mr. Sturgill also cited a problem with the shuttle on a single occasion; Mr. Schmidt could not recall ever handling an unprecedented situation. Such once in a lifetime occurrences should not drive an examination of day-to-day work for overtime exemptions.

Defendant also argues that the process of restoring equipment reflects work of an intellectual nature. However, as noted above, although an alert, intelligent individual is best suited to perform the assigned tasks, the process is largely one of running checklists on established procedures, and using test equipment and tools to troubleshoot and repair equipment on floors and work benches. Similarly, configuration changes were performed according to step-by-step procedures. Defendant has not carried its burden of demonstrating that the plaintiffs work was intellectual and varied in nature under the OPM definition.

*Specialized or Technical Nature*

As an alternative to work of an intellectual and varied nature, defendant may also attempt to demonstrate that the plaintiffs perform work "[o]f a specialized or technical nature that requires considerable special training, experience, and knowledge." 5 C.F.R. § 551.206(b)(2). OPM regulations define work of a specialized or technical nature as

[W]ork which requires substantial specialized knowledge of a complex subject matter and of the principles, techniques, practices, and procedures associated with that subject matter field. This knowledge characteristically is acquired through considerable on-the-job training and experience in the specialized subject matter field,

as distinguished from professional knowledge characteristically acquired through specialized academic education.

5 C.F.R. § 551.104; *see also* FPM Letter No. 551–7, attachment 1, paragraph B.1.k. The classifier of the electronic technician positions at Edwards Air Force Base testified that the work being performed by the electronic technicians at Edwards was equivalent to the work being performed by their counterpart electronic technicians at the FAA, and also equivalent to work performed by engineers at the journeyman level. A college degree was not required for the electronic technician positions at Edwards. The plaintiffs took short technical courses, and acquired considerable training and experience on the job. The plaintiffs, however, operated independently of their supervisor, who possessed an air traffic control background, rather than a background as an electronic technician. As a result, the plaintiffs would consult with each other as necessary on technical problems arising at work, rather than consulting with their supervisor on how to troubleshoot and repair malfunctioning equipment.

Mr. Berg worked as an electronic technician at Edwards Air Force Base between January 1987 and August 1991. He testified that initially he devoted almost all of his standby time to reading technical manuals, but that after he became more experienced, he was able to devote less of his standby time to this purpose. He testified that by the time he left Edwards, studying technical manuals only consumed about ten to twenty percent of his standby time. Mr. Berg testified that he possessed knowledge of "how electricity and electronic components work such as transistors, resistors, capacitors," which aided him in troubleshooting equipment faults.

Mr. Sturgill began working at Edwards Air Force Base as an electronic technician in 1986, and at the time of trial was so employed. He attended the FAA Academy for two months, as well as a number of other short, technical courses. He has earned enough credits for an associates degree in electronics, but does not have the formal degree. He possesses knowledge of comput-

ers, software, communications equipment, instrumentation test apparatus, and electronic circuitry. He indicated that he was able to draft preventive maintenance manuals, based on manufacturer data, and that other electronic technicians drafted similar manuals.

At the time of trial, Mr. Schmidt was employed as an electronic technician at Edwards Air Force Base, a job he began in 1983. He also attended the two-month FAA Academy, and has taken short, technical courses. Testimony was elicited that he possesses knowledge of communications equipment, computers and computer software, and considers himself a technical expert in his work.

Plaintiffs' work requires substantial knowledge of electronics, and of the principles, techniques, practices, and procedures associated with electronics. Plaintiffs' knowledge primarily has been acquired through considerable on-the-job training and experience, rather than through an academic education. The evidence indicates that the plaintiffs performed work of a technical nature, requiring considerable specialized training, experience, and knowledge. However, because plaintiffs' work did not constitute office or other non-manual work, defendant has not demonstrated that plaintiffs meet this second test for the administrative exemption.

*Discretion and Independent Judgment Test*

■ The third and final test for the administrative exemption provides that an employee "frequently exercises discretion and independent judgment, under only general supervision, in performing the normal day-to-day work." 5 C.F.R. § 551.206(c).

Discretion and independent judgment is defined by OPM regulations, as follows:

[W]ork that involves comparing and evaluating possible courses of conduct, interpreting results or implications, and independently taking action or making a decision after considering the various possibilities. However, firm commitments or final decisions are not necessary to support exemption. The "decisions" made as a result of the exercise of independent judgment may consist of *recommendations for action* rather than the actual taking of action. The fact that an employee's decisions are subject to review, and that on occasion the decisions are revised or reversed after review, does not mean that the employee is not exercising discretion and independent judgment of the level required for exemption. Work reflective of discretion and independent judgment must meet the three following criteria:

(1) The work must be sufficiently complex and varied so as to customarily and regularly require discretion and independent judgment in determining the approaches and techniques to be used, and in evaluating results. This precludes exempting an employee who performs work primarily requiring skill in applying standardized techniques or knowledge of established procedures, precedents, or other guidelines which specifically govern the employee's action.

(2) The employee must have the authority to make such determinations during the course of assignments. This precludes exempting trainees who are in a line of work which requires discretion but who have not been given authority to decide discretionary matters independently.

(3) The decisions made independently must be significant. The term "significant" is not so restrictive as to include only the kinds of decisions made by employees who formulate policies or exercise broad commitment authority. However, the term does not extend to the kinds of decisions that affect only the procedural details of the employee's own work, or to such matters as deciding whether a situation does or does not conform to clearly applicable criteria.

5 C.F.R. § 551.104 (emphasis in original); *see also* FPM Letter 551–7, attachment 1, paragraph B.1.I.

Defendant argues that, consistent with the OPM definition of discretion and independent judgment, the plaintiffs worked independently, were minimally supervised, and used personal initiative in accomplishing their work. The plaintiffs' testimony generally supported these conclusions. Mr. Berg, for example, testified that he worked without

direct supervision. As noted earlier, the plaintiffs' supervisor possessed an air traffic control background, not an electronic technician background, such that the plaintiffs would not normally discuss with their supervisor the details of how to perform the actual maintenance and repair on air traffic control equipment. Plaintiffs' supervisor scheduled the electronic technicians, and performed other administrative, personnel, and management functions for the Military Radar Unit, but did not become engaged in the actual details of the electronic technician work, other than to be debriefed on the status of equipment that was down for maintenance. Mr. Sturgill and Mr. Schmidt acknowledged that they worked independently, without direct supervision, and in briefs filed with the court plaintiffs' counsel also acknowledged that the electronic technicians were only "generally supervised." *See, e.g., Copas v. East Bay Mun. Util. Dist.*, 61 F.Supp.2d 1017, 1026–27 (N.D.Cal.1999) (an employee who testified that she was relatively free from the immediate direction and supervision of her immediate supervisor was found to be within the administrative exemption of the FLSA).

However, the plaintiffs were not as independent as this testimony would suggest. For the evidence also reflects that the plaintiffs were largely tied to step-by-step procedures as they checked, maintained, repaired, modified, and certified equipment. Mr. Berg, for example, testified that, to troubleshoot equipment faults, "you basically follow a set of guidelines." All three plaintiffs testified that work performance was based on procedures in technical manuals, troubleshooting flow charts, and diagnostics. Daily equipment certification was pursuant to step-by-step procedures and FAA standards. Preventive maintenance, equipment calibration, and equipment modifications and configurations, were all performed pursuant to established procedures. Using the words of the OPM definition, the plaintiffs' work primarily required "skill in applying standardized techniques or knowledge of established procedures, precedents, or other guidelines which specifically govern the employee's action." 5 C.F.R. § 551.104.

Department of Labor regulations on the administrative exemption from FLSA overtime eligibility, discussing discretion and independent judgment, also distinguish skill in following procedures:

(1) Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2 [the administrative exemption]. . . .

29 C.F.R. § 551.207(c)(1) (2000) (the above quoted language has not changed from 29 C.F.R. § 551.207(c)(1), promulgated in 1987). Although plaintiffs were highly skilled in following prescribed procedures for the maintenance and repair of equipment, the defendant has failed to demonstrate that the plaintiffs frequently exercised discretion and independent judgment in performing their normal day-to-day work. *Cf. Reich v. American Int'l Adjustment Co.*, 902 F.Supp. at 324 (private sector adjusters found not to come within the administrative exemption were "guided in [their] duties by skill and experience and by manuals which provide established labor and material costs."); *Hashop v. Rockwell Space Operations Co.*, 867 F.Supp. 1287, 1298 (S.D.Tex.1994) (under Department of Labor regulations, the court noted that the employees did not exercise the required discretion and judgment in their performance to qualify for the professional exemption, for they were highly trained technicians making decisions within a well-defined framework, and that "most of the proper responses to malfunctions are listed in a manual."); *Brock v. Nat'l Health Corp.*, 667 F.Supp. 557, 566 (M.D.Tenn.1987) (staff accountants in the private sector who merely followed the prescribed steps set out in a manual did not exercise discretion and independent judgment: "There is a difference between one

'who merely works around the place' [and] one who has something to say about 'running the place.' *Walling v. Newman,* 5 Wage and Hours Cases 436, 446 (S.D.N.Y.1945)." (alteration in original)).

## CONCLUSION

After trial, and for the foregoing reasons, the court finds that the defendant has not carried its burden of demonstrating that the plaintiffs were exempt from the overtime pay provisions of the Fair Labor Standards Act under the administrative exemption. The court finds that the plaintiffs are covered by the overtime pay provisions of the Act. In light of the court's decision, on or before **Friday, May 25, 2001,** the parties shall consult and file a joint status report with the court reflecting a calculation of damages for uncompensated overtime due each plaintiff to date.

**IT IS SO ORDERED.**